[S.F. No. 24611. Dec. 5, 1985.]

BARBARA WATERS, Plaintiff and Appellant, v.
RAY BOURHIS et al., Defendants and Respondents.

426

## COUNSEL

Robert Jay Katz, Katz & Lapdes and Richard J. Kohlman for Plaintiff and Appellant.

Musick, Peeler & Garrett, James E. Ludlam, Hassard, Bonnington, Rogers & Huber, David E. Willett, Horvitz & Levy, Ellis J. Horvitz, S. Thomas Todd and David M. Harney as Amici Curiae on behalf of Plaintiff and Appellant.

Ray Bourhis, in pro. per., Bourhis, Lawless & Harvey, Victoria J. De Goff, De Goff & Sherman, Jerome B. Falk, Jr., Howard, Rice, Nemerovski, Canady, Robertson & Falk, B. K. Wines and Wines, Robinson & Wood for Defendants and Respondents.

## OPINION

KAUS, J.*—In March 1980, plaintiff Barbara Waters filed this action against defendant Ray Bourhis, an attorney who had represented her in an earlier suit against a psychiatrist, contending that the contingency fee which defendant had obtained after settlement of the earlier action exceeded the maximum fee permitted by Business and Professions Code section 6146, a provision of the Medical Injury Compensation Reform Act of 1975 (MICRA).[1] Defendant moved for summary judgment, asserting that the ear-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] Unless otherwise indicated, all section references are to the Business and Professions Code.

In addition to Bourhis, the complaint named Bourhis' law firm as a defendant. Because the firm has no independent significance for this proceeding, we shall use the term "defendant" to refer both to Bourhis individually and to defendants as a group.

lier lawsuit was not an action for "professional negligence" within the meaning of section 6146 and, consequently, that the fee collected in that action was not subject to section 6146's limitations. Declarations were filed in support of and in opposition to the motion, and, after a hearing, the trial court granted summary judgment in defendant's favor. For the reasons discussed hereafter, we conclude that the judgment must be reversed.

I

In January 1977, plaintiff, who had a history of mental difficulties, began treatment with Dr. Jack Shonkwiler, a psychiatrist. According to the allegations of the complaint filed in the earlier action—allegations that were never admitted or proven—Shonkwiler started to engage in a variety of sexual activities with plaintiff a few months after treatment began. These activities allegedly "rang[ed] from directing her to observe [him] as he masturbated to compelling her to submit to sexual intercourse." The complaint alleged that at times Shonkwiler induced plaintiff to participate in sexual conduct by suggesting that it was part of the therapy designed to alleviate her sexual inhibitions, and at other times he coerced her to participate by threatening to have her institutionalized if she did not cooperate.

Plaintiff stopped seeing Shonkwiler in August 1977. The following spring, plaintiff cooperated with the police in a criminal investigation of Shonkwiler. In October 1978, she consulted defendant, who agreed to represent her in a civil action against Shonkwiler.

In a declaration filed in support of his summary judgment motion in the present proceeding, defendant stated that when plaintiff described to him the facts surrounding Shonkwiler's sexual activities with her, he "did not regard the allegations by [plaintiff] of the conduct of Shonkwiler as constituting medical negligence and so advised [plaintiff]." His declaration also stated that although he did not view the case as one of professional negligence, he advised plaintiff of the existence of section 6146 and told her that he would not represent her under the limitations of that statute.[2] Instead, defendant offered to take the case "either on an hourly basis ($50 or $65 per hour) or on the basis of our standard contingency fee agreement in personal injury cases," which provided for fees of (1) 33⅓ percent if recovery was obtained before the filing of a lawsuit, and (2) 40 percent after such a suit was filed. Plaintiff told him that she wanted to be represented

---

[2]When applicable, section 6146 limits attorney fees to (1) 40 percent of the first $50,000 recovered, (2) 33⅓ percent of the next $50,000, (3) 25 percent of the next $100,000 and (4) 10 percent of any amount exceeding $200,000.

on a contingency basis and signed the contingency fee agreement that defendant had prepared.[3]

In a counterdeclaration filed in opposition to the motion, plaintiff disputed defendant's account of their first interview in a number of respects, asserting that defendant never advised her that he did not regard Dr. Shonkwiler's conduct as medical negligence and did not inform her of the existence of section 6146 or of his unwillingness to represent her under its limitations.

A few days after their first meeting, defendant filed a complaint for damages against Shonkwiler on plaintiff's behalf. The complaint—entitled "Complaint for Damages—Malpractice-Medical"—sought recovery on a variety of legal theories: (1) negligence, (2) breach of duty of good faith, and (3) intentional or reckless infliction of emotional distress.[4] Both compensatory and punitive damages were requested.

In the course of discovery, defendant learned that Shonkwiler was insured under a "Psychiatrist's Professional Liability" policy which had a limit of $200,000 and which provided coverage for "damages . . . awarded against [the psychiatrist] in respect to services rendered by him in his practice of psychiatry" in any action based, inter alia, on "malpractice, . . . negligence, . . . personal restraint, assault, . . . [and] undue familiarity . . . ."

---

[3]A copy of the agreement was attached as an exhibit to the complaint in the present action. The first sentence reads: "I hereby retain and employ Bourhis, Lawless & Harvey as my attorneys to prosecute or settle all claims for damage against *Dr. Shonkwiler* or others who shall be liable on account of *med malp/intl inf ment distress* which occurred on or about *1977-78.*" (Italics added.) The italicized phrases had been filled in in longhand.

[4]The first cause of action—the negligence count—alleged, inter alia, that plaintiff was a patient in Shonkwiler's care and that Shonkwiler "carelessly and negligently advised, counseled and treated plaintiff; and carelessly, negligently and inadequately informed her of intended treatment, causing her condition to deteriorate and causing her further to sustain additional injuries and damages. . . ." After describing some of the specific alleged incidents of misconduct, this cause of action continued: "Throughout the entire course of conduct described Shonkwiler repeatedly and continuously used the reverse psychological condition of plaintiff, her dependence on him and his position as psychiatrist, to coerce her into believing that her mental condition was due to sexual inhibitions which would be resolved by his described treatment of her. It was only following the disclosure by plaintiff of these facts to a third party psychiatrist and subsequent confrontation between plaintiff and Shonkwiler that he admitted that he had been taking advantage of her psychological state and her dependence on him as her therapist."

The second count, after incorporating the factual allegations of the initial count, asserted that the defendant had "both a common law and statutory duty to exercise good faith and to deal fairly with patients in conjunction with his treatment of them" and alleged that defendant had breached that duty by acting "in bad faith" and with a "conscious disregard of the best interests" of his patient. Finally, the third count, after similarly incorporating the relevant factual allegations, alleged that Shonkwiler's actions "constitute[d] outrageous, unlawful, harmful and offensive conduct" and that they were undertaken with the "intention of causing or recklessly disregarding the possibility of causing emotional distress to the plaintiff."

After preliminary negotiations between defendant and Shonkwiler's insurer, in August 1979 the insurer initiated a declaratory judgment action against Shonkwiler, alleging that its policy did not provide coverage for Water's suit because Shonkwiler's acts did not arise out of professional services but amounted to criminal acts. Two months later, after continued negotiations by defendant on plaintiff's behalf, the insurer dismissed its own declaratory judgment action against Shonkwiler and, without admitting liability either on its own behalf or on behalf of its insured, agreed to settle plaintiff's action against Shonkwiler for $200,000, the policy limit.

In his declaration, defendant states that on October 31, 1979, at the meeting at which he presented the settlement agreement to plaintiff for her approval and signature, he provided her with a letter which explained how the $200,000 would be disbursed: he would retain 40 percent of the recovery ($80,000) plus an amount equal to his out-of-pocket expenses ($1,797.30) in accordance with the written fee agreement, and the balance ($118,202.70) would be plaintiff's net recovery. The letter also drew plaintiff's attention to section 6146, explained why defendant believed that the provision did not apply to her case,[5] and advised her to consult a lawyer who had no financial interest in the matter if she had any questions. In her counterdeclaration, plaintiff states that although the explanatory letter is dated October 31, she recalls receiving it on November 7—when she met defendant at a bank to endorse the settlement check—rather than at the October 31 meeting at which she signed the settlement agreement.

Shortly after obtaining the recovery, plaintiff did seek other legal advice and then brought the present action, alleging that defendant had obtained fees in excess of $18,000 greater than the fees to which he was entitled under section 6146. In his answer, defendant denied liability both on the ground that section 6146 was unconstitutional and on the ground that the underlying lawsuit was not based on "professional negligence" as that term is defined in section 6146. Defendant then moved for summary judgment on the latter ground, relying on his own declaration setting out the facts

---

[5]In the letter, defendant acknowledged that "[t]he complaint filed in your case includes professional negligence as well as intentional misconduct, including fraud and intentional infliction of emotional distress." It went on to explain, however, that the restrictions of section 6146 "apply only in standard medical negligence cases and not where the services in question are 'within any restriction imposed by the licensing agency.' [¶] In your case Dr. Shonkwiler's conduct was in violation of such a restriction, Business and Professions Code section 730 [now section 726], which provides that 'the commission of any act of sexual abuse, misconduct, or relations with a patient, client or customer which is substantially related to the qualifications, functions, or duties of the occupation for which a license was issued constitutes unprofessional conduct and grounds for disciplinary action for any person licensed under this division.' "

As discussed below, defendant continues to rely on this interpretation of section 6146 as one basis for supporting the trial court judgment in his favor.

described above and on a number of documents relating to the earlier lawsuit. As already noted, plaintiff filed a counterdeclaration, expressly disputing a number of facts contained in defendant's declaration.

At the conclusion of the hearing on the summary judgment motion, the trial court stated: "I'm going to find that most of the damage was outside the scope of professional negligence under which the attorney's fees is limited. So no limit on the fees in the case Mr. Bourhis handled and I'm going to grant summary judgment for the defendant." Plaintiff appeals from the judgment.

## II

In our recent decision in *Roa* v. *Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920 [211 Cal.Rptr. 77, 695 P.2d 164], we concluded that the statutory limits on attorney fees imposed by section 6146 are not unconstitutional on their face. Here, however, we are not faced with broad questions of the validity of the legislative provision, but with the much narrower problem of determining the proper application of section 6146 in a rather unusual "medical malpractice" setting.

The issue arises because section 6146's limitations on attorney fees do not apply to all types of actions against doctors or other "health care providers," but—like other provisions of MICRA[6]—only to actions which are "based upon [the provider's] alleged professional negligence. . . ."[7] Sec-

---

[6] See, e.g., Civil Code section 3333.1 (admissibility of evidence of collateral source benefits received by plaintiff); Civil Code section 3333.2 (limitation on noneconomic damages); Code of Civil Procedure section 340.5 (statute of limitations); Code of Civil Procedure section 364 (notice of intent to file action).

[7] Section 6146 provides in full: "(a) An attorney shall not contract for or collect a contingency fee for representing any person seeking damages *in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence* in excess of the following limits: [¶] (1) Forty percent of the first fifty thousand dollars ($50,000) recovered. [¶] (2) Thirty-three and one-third percent of the next fifty thousand dollars ($50,000) recovered. [¶] (3) Twenty-five percent of the next one hundred thousand dollars ($100,000) recovered. [¶] (4) Ten percent of any amount on which the recovery exceeds two hundred thousand dollars ($200,000). [¶] The limitations shall apply regardless of whether the recovery is by settlement, arbitration, or judgment, or whether the person for whom the recovery is made is a responsible adult, an infant, or a person of unsound mind. [¶] (b) If periodic payments are awarded to the plaintiff pursuant to Section 667.7 of the Code of Civil Procedure, the court shall place a total value on these payments based upon the projected life expectancy of the plaintiff and include this amount in computing the total award from which attorney's fees are calculated under this section. [¶] (c) For purposes of this section: [¶] (1) 'Recovered' means the net sum recovered after deducting any disbursements or costs incurred in connection with prosecution or settlement of the claim. Costs of medical care incurred by the plaintiff and the attorney's office-overhead costs or charges are not deductible disbursements or costs for such purpose. [¶] (2) 'Health care provider' means any person licensed or certified pursuant to Division 2 (com-

tion 6146, subdivision (c)(3)—again like the other sections of MICRA (see fn. 6, *ante*)—defines "professional negligence" for these purposes as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that the services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital."

We addressed a different question relating to the proper scope or reach of this "professional negligence" language of MICRA in *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063]. In *Hedlund,* the question presented was whether MICRA's statute of limitations—Code of Civil Procedure section 340.5—was applicable to an action against a psychiatrist which rested on the psychiatrist's alleged failure to warn a potential victim of the dangerous proclivities of the psychiatrist's patient, i.e., an action deriving from the duty of care recognized in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]. Like section 6146, section 340.5 applies only to actions based on a health care provider's alleged "professional negligence," and the defendant in *Hedlund* argued that the action in that case did not fall within that category on the ground that a psychiatrist's failure to take steps to protect a potential victim of his patient did not involve a failure to render professional services but rather an act of ordinary negligence.

We rejected that contention in *Hedlund,* concluding that the duty to warn was "inextricably interwoven" with the doctor's professional responsibilities. We reasoned: "*Tarasoff* recognizes a right to expect that a licensed psychotherapist will realize when a patient poses a serious danger to another and, if that potential victim is identifiable, will act reasonably to protect the victim. The diagnosis and the appropriate steps necessary to protect the victim are not separate or severable, but together constitute the duty giving rise to the cause of action." (34 Cal.3d at p. 704.)

Although *Hedlund* does demonstrate that MICRA's reference to actions based on "professional negligence" is not strictly limited to classic sponge-

---

mencing with Section 500), or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider. [¶] (3) *'Professional negligence' is a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that the services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.*" (Italics added.)

in-the-patient medical malpractice actions, that decision provides little direct guidance for the case at bar. Here, defendant's claim that the earlier action was not subject to the attorney fee limitations of MICRA does not rest on a contention that the injured victim was not a person to whom the health care provider owed a professional duty of care: she was, of course, the patient. Instead, defendant essentially argues that the trial court properly concluded, in granting summary judgment, that her recovery in the earlier suit was based on *intentional misconduct* in which the psychiatrist engaged for personal, as opposed to professional, motives, and that such an action does not fall within the category of "professional negligence" actions to which MICRA was intended to apply. In analyzing defendant's claim, it is necessary to separate a number of distinct lines of argument embraced by the contention.

### A

■ To begin with, insofar as defendant maintains that the summary judgment in his favor can be affirmed on the ground that the record in this case demonstrates—as a matter of law—that the recovery in the earlier action was *not* based on an action for professional negligence, we think his position is untenable for a number of reasons.

First of all, it is, of course, quite clear from the record that the complaint in the earlier action sought recovery from the psychiatrist *both* on theories of negligence and of intentional tortious conduct. Although many of the factual allegations of that complaint—*if true*—may well have rendered the psychiatrist liable on an intentional tort theory, those allegations were never resolved in that action because the case was settled. In addition to the allegations of intentional misconduct, the complaint alleged that the psychiatrist's course of conduct constituted negligent treatment, and many out-of-state decisions have found that similar instances of sexual conduct between psychiatrist and patient may give rise to a medical malpractice action on just such a basis. (See, e.g., *Cotton v. Kambly* (1980) 101 Mich.App. 37 [300 N.W.2d 627, 628-629]; *Zipkin v. Freeman* (Mo. 1968) 436 S.W.2d 753, 761-762; *Aetna Life & Cas. Co. v. McCabe* (E.D.Pa. 1983) 556 F.Supp. 1342; *St. Paul Fire & Marine Ins. Co. v. Mitchell* (1982) 164 Ga.App. 215 [296 S.E.2d 126, 33 A.L.R.4th 1]; *Roy v. Hartogs* (1976) 85 Misc.2d 891 [381 N.Y.S.2d 587]; *Anclote Manor Foundation v. Wilkinson* (Fla.Ct.App. 1972) 263 So.2d 256.)[8] Because the settlement agreement did

---

[8]For example, in upholding a patient's right to maintain a medical malpractice action when a complaint alleged that the defendant psychiatrist had "induced her to engage in sexual intercourse with him during the course or under the guise of psychiatric treatment," the court in *Cotton v. Kambly, supra,* 300 N.W.2d 627, 628-629, explained: "Part of plaintiff's claim is for medical malpractice, which has been defined as the failure of a member of the

not foreclose the possibility that the psychiatrist's liability rested simply on his negligent mishandling of the so-called "transference phenomenon" (see fn. 8, *ante*), the record does not establish as a matter of law that the earlier recovery was not based on professional negligence.[9]

Furthermore, even if the complaint's allegations of intentional misconduct had been established, it still would not follow that the recovery was based *solely* on an intentional tort theory. A number of out-of-state decisions have explained that even when a psychiatrist intentionally abuses the therapist-patient relationship for his own personal sexual desires, there is no reason why the injured patient may not maintain both an action for an intentional tort and an action for professional malpractice or negligence. (See, e.g., *Cotton* v. *Kambly, supra,* 300 N.W.2d 627, 629; *Aetna Life & Cas. Co.* v. *McCabe, supra,* 556 F.Supp. 1342, 1353.) In such a case, the psychiatrist has breached both the duty imposed on everyone to refrain from intentionally injuring another and the special duty that a psychiatrist owes to his patient to use due care for the patient's health in the conduct of the therapist-patient relationship. Under such circumstances, there is little justification for limiting the patient solely to an intentional tort action against the psychiatrist and foreclosing her recovery from any available malpractice insurance which, after all, is generally intended to protect patients from the risks

---

medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession. . . . Plaintiff alleges that defendant induced her to engage in sexual relations with him as part of her prescribed therapy. We see no reason for distinguishing this type of malpractice and others, such as improper administration of a drug or a defective operation. In each situation, the essence of the claim is the doctor's departure from proper standards of medical practice. . . . The fact that defendant may also be subject to criminal and professional sanctions for his conduct is no reason for denying plaintiff her right to bring a civil action for malpractice."

Similarly, in *Zipkin* v. *Freeman, supra,* 436 S.W.2d 753, the court rejected a malpractice insurer's contention that it was not obligated to pay a judgment arising out of its insured psychiatrist's sexual misconduct with a patient. In response to the insurer's claim that the damages were based on the psychiatrist's personal, rather than professional, tortious conduct, the *Zipkin* court observed: "The gravamen of the petition is that defendant did not treat Mrs. Zipkin properly and as a result she was injured. He mishandled the transference phenomenon, which is a reaction the psychiatrists anticipate and which must be handled properly. He mishandled it over a long period of time. . . . [U]nder the petition and the evidence, [the psychiatrist] did not give Mrs. Zipkin the professional service he should have. The damages she sustained resulted from such failure and are within the policy coverage." (436 S.W.2d at pp. 761-762.)

[9]The dissent refers to a police report that was attached as an exhibit to defendant's motion for summary judgment. As we read the report, there is no suggestion that the psychiatrist arranged for a sexual encounter between plaintiff and another man, but, in any event, the report is simply a summary of a statement which plaintiff gave to the police and does not purport to assess the truth of the statement. The report certainly does not establish the basis for the recovery in the earlier lawsuit as a matter of law.

arising out of the professional relationship.[10] Thus, even if we could legitimately assume that the earlier complaint's allegations of intentional misconduct on the part of the psychiatrist were true—and, on this record, we may not—we still could not rule out the possibility that the earlier recovery rested, at least in part, on a theory of professional negligence. (Cf. *American Employer's Ins. Co.* v. *Smith* (1980) 105 Cal.App.3d 94, 100-102 [163 Cal.Rptr. 649] ["A showing of willfulness does not as a matter of law negate negligence."].)[11]

B

Nor can we accept defendant's theory—first set forth in his explanatory letter to plaintiff when she was still his client (see fn. 5, *ante*)—that the summary judgment can be sustained on the ground that the initial action was excluded from the scope of section 6146 by virtue of the proviso in the definition of "professional negligence." That proviso excepts from the reach of MICRA acts or omissions of a health care provider which are "within any restriction imposed by the licensing agency or licensed hospital."

---

[10]In *Hartogs* v. *Employers Mut. Ins. Co. of Wis.* (1977) 89 Misc.2d 468 [391 N.Y.S.2d 962, 964], a case arising out of similar facts, the court observed that "[a] distinction should be drawn in a factual situation such as this between medical malpractice in the mind of the patient and medical malpractice in the mind of the doctor. Plainly when the patient submitted [to the doctor's acts] she believed that appropriate medical therapy was being administered. Only some time thereafter did she discover that she had been duped, the victim of fraud and subterfuge. On the other hand, the doctor administering the 'treatment' at all times knew, and has so stated in the previous trial and on this motion, that what he was doing was in no way pursuant to the doctor-patient relationship. The obvious purpose was to permit him to accomplish his personal satisfaction. [¶] The distinction to be drawn between the injured party and the insured is clear. No longer is it the law in this state 'that the liability policy existed solely for the protection of the insured' [citation]. The courts recognize that the injured person also is to be protected." Accordingly, while the court indicated that the injured patient had properly recovered for her injuries from the insurer, it concluded that the doctor was not entitled to be reimbursed by the insurer for costs he had incurred in defending against the patient's claim. "[A]s between the [doctor] and his insurer those actions could not constitute malpractice and were never intended to be included within the protective coverage of the malpractice policy." (*Id.,* at p. 965.)

[11]Amicus California Hospital Association argues that "professional negligence" in section 6146 and other MICRA provisions should be construed to encompass not only "negligent" acts of a health care provider but also those "intentional" acts of such a provider which are insurable under Insurance Code section 533 as interpreted in *Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865 [151 Cal.Rptr. 285, 587 P.2d 1098]. As *Clemmer* explains (at p. 887), ". . . an act which is 'intentional' or 'willful' within the meaning of traditional tort principles will not exonerate the insurer from liability under Insurance Code section 533 unless it is done with a 'preconceived design to inflict injury.'"

We have no occasion in this case to decide whether amicus' proposed construction is an appropriate interpretation of the statutory language. Because the initial lawsuit against the psychiatrist was settled, the record does not establish whether the psychiatrist's conduct falls into the "uninsurable" as opposed to the "insurable" category, any more than it establishes whether his conduct was "intentional" rather than "negligent." Thus, even if amicus' suggested reading of the statute were proper, it would not affect the result in this case.

Defendant argues that because sexual misconduct by a psychiatrist toward a patient has long been a basis for disciplinary action by the state's licensing agency (see, e.g., *Cooper v. Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 949 [123 Cal.Rptr. 563]),[12] any cause of action which is based on such misconduct falls within the proviso, as a "restriction imposed by the licensing agency." In our view, this contention clearly misconceives the purpose and scope of the proviso which obviously was not intended to exclude an action from section 6146—or the rest of MICRA—simply because a health care provider acts contrary to professional standards or engages in one of the many specified instances of "unprofessional conduct." Instead, it was simply intended to render MICRA inapplicable when a provider operates in a capacity for which he is not licensed—for example, when a psychologist performs heart surgery. On the basis of the record in this case, we think it is clear that the psychiatrist's conduct arose out of the course of the psychiatric treatment he was licensed to provide.

## C

There is one remaining theory on which the summary judgment in defendant's favor could be upheld. As we have seen, on the record in this case we cannot find as a matter of law that the recovery in the first action rested on an intentional tort *rather than* a negligence theory; the complaint alleged both theories and the case was settled without specifying on what theory the recovery was based. If, however, section 6146's limitations on attorney fees are inapplicable whenever a plaintiff's recovery may have been based on *both* non-MICRA and MICRA causes of action, then the trial court may have been justified in concluding that the limitations should not apply in this case.

Neither section 6146 nor any other provision of MICRA specifically addresses the question of how such a "hybrid" proceeding should be treated. We are unaware, however, of anything in the legislative history of MICRA which suggests that the Legislature intended either to require a plaintiff to make an election between two viable theories of recovery—one MICRA and one non-MICRA—or to prohibit such a plaintiff from joining MICRA and non-MICRA causes of action in a single proceeding. Because there is nothing in section 6146 that purports to limit the fee an attorney may earn

---

[12]In 1977, when the psychiatrist allegedly engaged in improper sexual conduct with plaintiff, former section 2361 defined "unprofessional conduct" by a physician to include (1) "repeated similar negligent acts," (2) "gross immorality" and (3) "commission of any act involving moral turpitude." (Former § 2361, subds. (c), (e), (f).) In 1979, a new section—currently section 726—was enacted which expressly provides that "any act of sexual abuse, misconduct or relations with a patient . . . which is substantially related to the . . . functions, or duties of the occupation for which a license was issued constitutes unprofessional conduct and grounds for disciplinary action . . . ." (Stats. 1979, ch. 955, § 1, p. 3294.)

outside of the MICRA context, when MICRA and non-MICRA causes of action are properly joined in one proceeding we can find no basis for limiting the fee that an attorney may permissibly obtain *for successfully litigating the non-MICRA claim.*

For a plaintiff, there are both potential benefits and detriments in proceeding on a non-MICRA theory when a MICRA action may also be maintained. The principal benefits, of course, are that in a non-MICRA action the plaintiff is not subject to (1) the $250,000 limit on noneconomic damages (Civ. Code, § 3333.2), (2) the potential reduction of economic damages on the basis of the plaintiff's receipt of collateral source benefits (Civ. Code, § 3333.1), or (3) the periodic payment of damages procedure (Code Civ. Proc., § 667.7); the main detriment is that the plaintiff's attorney is permitted to charge a greater fee than is allowed under MICRA. Indeed, as we noted in *Roa,* one of the purposes of section 6146's limitation on attorney fees may have been to help preserve a greater proportion of a plaintiff's diminished MICRA recovery for the plaintiff's own benefit. (See 37 Cal.3d at p. 932.) ■ Accordingly, when a plaintiff pursues and recovers on a non-MICRA cause of action, it is reasonable to conclude that section 6146's attorney fee limits should not apply, even if the plaintiff at the same time also succeeds on a separate MICRA cause of action.

It is true, of course, that when—as in this case—a hybrid proceeding is settled without specifying on what theory the recovery is based, it will generally be impossible to determine with certainty what role the defendant's potential non-MICRA liability played in producing the settlement. Nonetheless, at least as a general matter, it appears reasonable to assume that the possibility that the plaintiff might recover a judgment in excess of MICRA's limits will have had at least some effect on the amount of the settlement received. Since the plaintiff in such a case will generally have obtained the benefit of proceeding on a non-MICRA theory in the form of a larger settlement award, it would be inequitable to permit such a plaintiff thereafter to insist that his or her attorney's fee be limited by the MICRA provision. For this reason, we conclude that when a plaintiff knowingly chooses to proceed on both non-MICRA and MICRA causes of action, and obtains a recovery that may be based on a non-MICRA theory, the limitations of section 6146 should not apply.[13]

---

[13]We recognize, of course, that many malpractice actions will be pursued both on MICRA and non-MICRA theories, in the hopes of circumventing MICRA's provisions. With respect to the provisions of MICRA which affect the amount of a health care provider's—or its insurer's—liability, the filing of a hybrid action may not pose a significant problem; if a plaintiff's non-MICRA theories are not viable, a defendant's settlement offer would presumably not be significantly affected and should reflect the plaintiff's probable recovery if the

Nonetheless, on the present record the summary judgment in favor of defendant cannot be upheld. Because the amount of a client's attorney fee may be affected by whether an action is pursued on a MICRA or non-MICRA basis and because there may be a potential conflict of interest between the attorney and client on this matter, we believe that an attorney who in such a case seeks to collect a larger fee than that authorized by section 6146 must specifically advise the client or potential client of the pros and cons of alternative litigation strategies, including potential attorney fees, and obtain the client's consent to pursue and settle a non-MICRA action as well as a MICRA claim.[14] In the present case, the affidavits are in conflict as to what advice the attorney provided to his client in this regard. In his declaration, defendant states that at their first meeting he advised plaintiff that he did not consider the action as one involving professional negligence and that he specifically informed her before she signed the fee agreement that he would not represent her under the restrictions of

case were to go to trial.

With respect to section 6146, however, the situation is admittedly different. Since settlements will ordinarily not establish whether the non-MICRA theories were without merit and played no significant role in the settlement recovery, there is a potential danger that the limits of section 6146 could be improperly avoided.

. The risk that section 6146 will be undermined in this fashion, however, assumes that plaintiffs' attorneys will routinely act against their own clients' interests, interposing frivolous or extremely weak non-MICRA theories simply to increase their own contingency fees at the expense of their clients. Although we assume that plaintiffs' attorneys will be quite innovative in attempting to devise non-MICRA theories when they believe in good faith that such innovation will work to their clients' benefit, we cannot properly assume that they will adopt such tactics when it is simply in their own interest and contrary to their clients' interest, for such conduct would violate their professional obligations to their clients. Furthermore, as indicated hereafter, the attorney may recover fees in excess of those permitted under section 6146 only if the client knowingly consents to the pursuit of a non-MICRA cause of action.

[14] In 1982, the Legislature enacted section 6147, regulating contingency fee contracts. The section provides in full: "(a) An attorney who contracts to represent a plaintiff on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the plaintiff, or his guardian or representative, to the plaintiff, or to the plaintiff's guardian or representative. The contract shall include, but is not limited to, the following: [¶] (1) A statement of the contingency fee rate which the client and attorney have agreed upon. [¶] (2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery. [¶] (3) A statement as to what extent, if any, the plaintiff could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney. [¶] (4) Unless the claim is subject to the provisions of Section 6146, a statement that the fee is not set by law but is negotiable between attorney and client. [¶] (5) If the claim is subject to the provisions of Section 6146, a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement, and that the attorney and client may negotiate a lower rate. [¶] (b) Failure to comply with any provision of this section shall render the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee. [¶] (c) This section shall not apply to contingency fee contracts for the recovery of workers' compensation benefits."

section 6146.[15] In her declaration, plaintiff directly disputes defendant's statement, asserting that defendant did not advise her that he did not regard the psychiatrist's conduct as constituting negligence, did not inform her of the existence of section 6146 and did not indicate that he would not represent her under the limitations of that section.[16] Since the question of whether plaintiff knowingly consented to the pursuit and settlement of a cause of action that would not be subject to the limitations of section 6146 remains in dispute, summary judgment should not have been granted.

The judgment is reversed. Because of the limited ground of the reversal, each party shall bear its own costs on appeal.

Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**MOSK, J.**—I dissent.

The majority are correct when they declare that "when a plaintiff knowingly chooses to proceed on both non-MICRA and MICRA causes of action, and obtains a recovery that may be based on a non-MICRA theory, the limitation of section 6146 should not apply." (*Ante*, p. 437.) At that point, the majority are on the right track. With that rule, the matter should have ended.

Unfortunately, however, they become derailed in much of the balance of their opinion, and their view of what constitutes medical treatment is incredible. They speak of "a rather unusual 'medical malpractice' setting" (*ante*, p. 431) and then conclude "it is clear that the psychiatrist's conduct arose out of the course of psychiatric treatment he was licensed to provide." (*Ante*, p. 436.)

To the contrary, sexual misconduct by a medical doctor has long been considered entirely outside the scope of treatment; indeed, medical licenses have been revoked therefor. (See, e.g., *Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 949 [123 Cal.Rptr. 563].)

Under the majority's gross extension of what may be deemed in "the course of psychiatric treatment," I can conceive of them finding that

---

[15]Of course, even if plaintiff had knowingly agreed to the attorney's stated condition with respect to the fee that he would charge, if thereafter plaintiff had obtained a recovery solely on the basis of a MICRA cause of action, section 6146 would limit the attorney fee notwithstanding plaintiff's consent to a higher fee.

[16]As noted, there is also a conflict in the declarations as to whether defendant gave plaintiff the letter which advised her of the provisions of section 6146 and explained his conclusion that its limits did not apply in this case, before plaintiff agreed to the settlement. (See p. 430, *ante*.)

MICRA applies when (1) a medical doctor publishes a libelous statement in the local press about his patient; (2) a doctor goes berserk in his office and commits mayhem on his patient; or (3) a psychiatrist steals jewelry out of his patient's handbag during her session on the couch. Sexual misconduct is just as egregious as, and no less independent of medical treatment than, libel, mayhem and theft.

Most significantly, the majority ignore the finding of the trial court, after hearing in open court, that the damage asserted by plaintiff was primarily the result of deliberate, intentional conduct by the psychiatrist and not mere professional negligence. We are bound by that factual determination. That the finding was based on affidavits and the pleadings rather than testimony does not negate our duty to accept it.

At the hearing on the motion for summary judgment, counsel for plaintiff relied almost exclusively on the terms of the insurance contract and the fact that settlement had been made on the basis of insurance coverage. But the trial court observed that the unusually broad provisions of the insurance policy covered the psychiatrist not only for professional negligence, but also for assault, libel and slander, malicious prosecution and "undue familiarity," all of which are intentional torts and in most instances criminal acts.

The court also considered exhibit A to the pleadings, a police report concerning a three-day camping trip arranged by the psychiatrist entirely for plaintiff's sexual encounter with him and another man: a *ménage à trois*. It can hardly be contended that such salacious conduct constituted mere professional negligence.

After considering the affidavits, the insurance policy, and argument of counsel, the experienced trial judge stated: "I'm going to find that most of the damage was outside the scope of professional negligence under which the attorney's fees is [*sic*] limited. So no limit on the fees in the case Mr. Bourhis handled and I'm going to grant summary judgment for the defendant."

Under these circumstances I see no reason to remand the matter to the trial court for further proceedings. Let this case now rest in peace.

Bird, C. J., concurred.