[No. E029558. Fourth Dist., Div. Two. Aug. 26, 2002.]

JOHN Y., JR., a Minor, etc., Plaintiff and Appellant, v.
CHAPARRAL TREATMENT CENTER, INC., et al., Defendants and
Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts C.1. and C.2.

COUNSEL

Law Offices of Jack H. Anthony and Jack H. Anthony for Plaintiff and Appellant.

Stafford & Jackson, Timothy J. Stafford; and Donna Bader for Defendants and Appellants.

OPINION

RAMIREZ, P. J.—This appeal arises out of a counselor's sexual molestation of plaintiff, John Y., Jr. (John Y.), while he lived at a group residential facility for emotionally troubled youth. John Y. appeals from a judgment notwithstanding the verdict (JNOV) in favor of defendants Victor Treatment Centers, Inc. (Victor), doing business as Chaparral Treatment Center, Inc. (Chaparral, together Victor/Chaparral), and North Valley School, Inc. (NVS, collectively Defendants), on the issue of punitive damages. John Y. also claims that the trial court erred by refusing to instruct the jury on the issue of Defendants' vicarious liability for the molester's acts, and by apportioning general damages despite Defendants' breach of nondelegable duties. Defendants have filed a precautionary cross-appeal, claiming that there was no substantial evidence to support an award of punitive damages against them, and that the punitive damages assessed were excessive. We affirm.

### FACTS AND PROCEDURAL HISTORY

John Y., then 11 years old, was placed in a residential facility operated by Victor/Chaparral in April 1999. Children housed there were classified as seriously emotionally disturbed, requiring supervision one step below institutionalization. The majority of children living in the residential facility, including John Y., attended NVS, an affiliated school that maintained regular communication with the group home.

Mark Seflin (Seflin) was John Y.'s clinician while he lived at the facility. While Seflin had a degree in marriage, child and family counseling, as John Y.'s clinician he was an unlicensed "MFT" intern. As clinician, he was responsible for providing individual and group therapy for John Y. and other residents of the facility, and for ensuring their care and well-being. He also provided leadership for the treatment team. In addition to Seflin's clinical duties, certain witnesses and documents further identified him as having acted as house manager while John Y. was there. Seflin's supervisor was Sharlene Caraway (Caraway), then the assistant executive director in charge of overseeing the clinical aspect of all Victor/Chaparral residential facilities.

Steve Ayala (Ayala) first became employed at NVS, where he worked as a teacher's aide, in October 1997. During the summer of 1999, he worked most days at both NVS and the residential facility where John Y. lived. As a residential counselor at the facility, Ayala was in charge of ensuring that the residents got dressed, maintained proper hygiene, did their homework, ate properly, took their medications, followed the rules and behaved themselves. Residential counselors implemented clinical orders as needed and were encouraged to develop a therapeutic relationship with the residents.

Ayala had no prior experience with emotionally disturbed children and had no classes in psychology. His basic training was limited to social skills, acting-out skills and cardiopulmonary resuscitation. He considered himself to be a counselor in that he taught academic as well as behavioral skills, but did not believe he did anything to help the residents' psychological conditions.

Approximately one or two months after Ayala began working at the facility, Seflin saw John Y. resting himself against Ayala in the television room. He felt that there was nothing unusual about the way that John Y. was touching Ayala and did not observe that the relationship between John Y. and Ayala was different or closer than between John Y. and other staff members. Still, Seflin told Ayala that such contact may be misunderstood and may make him vulnerable to allegations by children seeking to be rid of him. John Y. did say things to try to get staff fired and had, consistent with that goal, accused staff members of being child abusers and molesters. At that time Seflin also knew from NVS staff that when John Y. would get out of control, Ayala was the only one who could deal with him.

John Y. was resistant to sharing things with Seflin during their therapy sessions. Nevertheless, on November 3, 1999, at the urging of staff, John Y. told Seflin that he had been experiencing blood in his stool for a couple of months, but denied knowing what the cause might have been. John Y. stated that he had not reported it sooner because he was embarrassed and did not want to be teased. Seflin had actually learned of the problem during a team meeting weeks prior to John Y.'s report. Two staff members reported that John Y. told them about the bleeding. Seflin arranged for a doctor's appointment to be made, but staff forgot to set up the appointment and John Y. never went. Seflin did not suspect that John Y.'s rectal bleeding could have been associated with sexual abuse, although he knew it was a possible result of sodomy. It was also a possible side effect of the psychotropic medications that John Y. was taking.

Seflin did not prepare and had not seen a special incident report prepared by any staff at the facility relative to John Y.'s bleeding, nor did he notify

anyone that the Chaparral client services procedure manual indicated should be notified. The quarterly report for John Y. that Seflin signed on November 3, 1999, indicated that John Y. had not needed medical attention since the last report.

On November 18, 1999, Seflin phoned John Y.'s father because he was concerned about the boy's regression in behavior since returning from his last home visit. During that conversation, Seflin was informed that John Y.'s parents wanted to discuss something with him, in person. He offered to meet with them immediately, but was told it was not an emergency. He set up an appointment with them for three days later. During that meeting, John Y.'s parents informed Seflin that Ayala had been phoning John Y. and had been to their home to visit John Y. several times, since as early as August. Although the parents did not suspect sexual abuse, Seflin told them that Ayala was displaying classic grooming behavior engaged in by molesters. The parents also told Seflin about Ayala's relationship with a child named Adam.

Seflin later learned that the parents were referring to Adam M., who had been a resident at the same facility as John Y. from May 1998 through March 1999. Defendants were aware that Ayala and Adam M. had experienced "boundary issues." Boundary issues, which are common among residents of the facility, include physical contact between staff and residents, staff taking residents out, or visiting or calling them at home, and perhaps staff giving residents gifts. Physical contact between children and residential staff such as handshakes and side hugs were permissible, but front and back hugs, stroking a cheek, kissing on the forehead and sexual contacts were not, according to Victor/Chaparral policy. Although both he and Adam M. were counseled, Ayala was never given a "write-up" or threatened with termination or suspension for his behavior with Adam M.

Seflin immediately informed his supervisor, Caraway, of what he had learned from John Y.'s parents regarding Ayala's behavior. He was concerned by Ayala's violation of company policy and the parents' failure to report it sooner. At that time he became suspicious that Ayala might be molesting John Y. However, he did not timely prepare either a special incident report or a suspected child abuse report, nor did he notify John Y.'s social worker or case manager. In fact, Seflin never reported known or suspected abuse of John Y. despite the fact that he was a mandatory reporter.

Caraway told Bob Crigler (Crigler), executive director of Chaparral and NVS, about Seflin's report and on November 24, 1999, they, along with NVS principal Dr. June Moore (Moore), confronted Ayala about the reports

that he had been visiting John Y. at home. Ayala denied that he had. Crigler phoned John Y.'s parents seeking confirmation of Ayala's rule violation, and left a message that they should call as soon as possible. His phone call was not returned. While no disciplinary action was taken against Ayala, Crigler advised Moore to ensure that he was not left alone with students under any circumstances.

That same day, John Y. left the residential facility for Thanksgiving. Neither he nor Ayala ever returned there. While home, John Y. told his stepmother that he had been bleeding from the rectum, so she arranged for him to be seen by a doctor. After having spoken with Seflin, John Y.'s parents thought that he might have been molested. Dr. Shah, who did not see John Y. on a referral until December 13, 1999, found that John Y.'s rectal injuries could have been caused by a number of things, one of which was sexual abuse.

Deputy Sheriff Danielle French (French) was assigned to this case that same day. When she asked John Y. if he had been sodomized and if so, by whom, he initially identified Manny Aguilar (Aguilar), another residential counselor. When Crigler was informed that the medical exams had revealed evidence of possible molestation and that John Y. had identified Aguilar, Crigler immediately suspended Aguilar and put together an investigation team.

French interviewed Aguilar, who denied the accusation and identified Ayala as having had an inappropriate relationship with John Y. Aguilar reported that Ayala was spoiling John Y. by buying him gifts, much the same way as he had done with Adam M. French informed Crigler that she suspected that Ayala, rather than Aguilar, was the guilty party. However, she asked Crigler not to initiate any investigation for a couple of days. French later concluded that John Y.'s accusation against Aguilar was false.

Late in the evening on December 14, 1999, John Y.'s stepmother called and told French that he had identified Ayala. When French interviewed John Y. a second time, he identified Ayala and indicated that he had lied before in order to protect Ayala from going to jail, and to protect him from his father. John Y. reported that four incidents of sodomy occurred between October 30 and November 20, 1999.

On December 15, 1999, French went to NVS to interview Ayala, who initially lied about his sexual misconduct. However he agreed to take a polygraph, during which he admitted sodomizing John Y. on three occasions, beginning in June 1999. He was immediately arrested on suspicion of child abuse.

Crigler learned that John Y. had been sexually molested when French told him that Ayala had confessed. After Ayala's arrest, Crigler sent him a letter of termination, giving the reason for termination as abandonment of employment.

As a result of the incidents involving John Y. and Ayala, Victor was investigated by, and received a citation from, its licensing agency for violating certain regulations under California Code of Regulations, title 22 (Title 22). Title 22 sets forth the criteria under which group residential facilities, such as those run by Victor/Chaparral, are supposed to operate in order to obtain a license from the State of California. In response to the citation, Victor implemented a plan of correction. At no time has Victor/Chaparral opposed or appealed the citation.

The operative second amended complaint, filed June 15, 2000, alleged seven causes of action against Defendants, Ayala, and others not parties to this appeal. They included breach of mandatory duties, negligent supervision, general negligence, sexual battery, sexual harassment, intentional infliction of emotional distress, and assault.

After a trial, a jury found that Defendants violated alleged mandatory duties under Title 22, negligently supervised their staff, and were otherwise negligent, all resulting in damages to John Y. The jury also found that Ayala sexually battered and harassed John Y. and intentionally caused him to suffer emotional distress. John Y. was awarded $350,000 in economic and $850,000 in noneconomic damages. Victor/Chaparral was found to be 40 percent liable, and NVS and Ayala were each found 30 percent liable. Finally, the jury found that Ayala acted with malice, oppression or fraud, and that Defendants authorized or ratified his wrongful conduct. As such, after a separate trial on the issue of punitive damages, the jury assessed $1 million against Victor/Chaparral, $450,000 against NVS and $65,000 against Ayala. Judgment was entered on February 8, 2001.

On February 28, 2001, Defendants filed motions for a new trial and for a JNOV, both on the issue of punitive damages. The motions were made on the grounds that the evidence was insufficient to support a finding that Defendants' director, officer or managing agent had knowledge of or ratified Ayala's actionable misconduct. Defendants also claimed that the punitive damages award was excessive. John Y. filed separate oppositions to the motions on March 8, 2001, both contending that ample evidence showed that Seflin was Defendants' managing agent and had actual knowledge of Ayala's pattern of inappropriate conduct. On April 2, 2001, Defendants filed a joint reply addressing both the opposition to the motion for new trial and to

the motion for JNOV. The reply was supported by an additional declaration by Defendants' attorney, portions of the trial transcript, a transcript from a sheriff's department interview of Adam M., and a page from the house log of the residential facility. John Y. filed objections to Defendants' reply on the ground that it violated Code of Civil Procedure section 659a, which requires that affidavits in support of a motion for a new trial be submitted within 10 days of the filing of the notice of intention to move for a new trial.

The motions were heard and granted on April 12, 2001. The trial court noted that the evidence was insufficient to support an award of punitive damages against Defendants in that it failed to show ratification of Ayala's conduct by Defendants' managing agent. A JNOV was entered on May 14, 2001, vacating the jury's award of punitive damages against Defendants. This appeal and cross-appeal followed.

## DISCUSSION

### A. Refusing to Instruct the Jury on Vicarious Liability Was Not Error

The trial court refused to instruct the jury using BAJI Nos. 13.01 and 13.06, as well as plaintiff's special jury instructions one and two, all of which concerned the issue whether Defendants could be held vicariously liable for Ayala's acts according to the doctrine of respondeat superior. John Y. claims that this refusal was erroneous. We disagree.

■ Generally, if the pleadings and substantial evidence presented at trial support a particular theory of the case, the parties have a right to have the jury instructed on that issue. In reviewing whether a requested instruction was properly refused, the appellate court views the evidence in the light most favorable to issuing the instruction. (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1157 [84 Cal.Rptr.2d 257].)

■ Equally well established is the general principle that "[u]nder the doctrine of respondeat superior, an employer is vicariously liable for his employee's torts committed within the scope of the employment." (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676].) While the determination whether an employee's acts are within the course and scope of employment is usually a question of fact, where, as here, the facts are not in dispute, the issue becomes a question of law. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1019 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers Ins. Group*).) The issue may also be decided as a matter of law when the court concludes that " 'the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the

scope of employment. . . .' " (*Maria D. v. Westec Residential Security, Inc.* (2000) 85 Cal.App.4th 125, 137 [102 Cal.Rptr.2d 326].)

■ The scope of employment has been broadly interpreted by the courts of this state. Employer liability has been imposed when the employee was not pursuing the aim of the employment at the time of the tort, when the employee's acts were willful or malicious, and even when the acts were against the employer's rules or policies and conferred no benefit upon it. (*Farmers Ins. Group, supra*, 11 Cal.4th at p. 1004.)

Nevertheless, an "employer will not be held liable for an assault or other intentional tort that did not have a causal nexus to the employee's work." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 297 [48 Cal.Rptr.2d 510, 907 P.2d 358] (*Lisa M.*).) This nexus requires "that the tort be engendered by or arise from the work." (*Id.* at p. 298.) In other words, "the incident leading to injury must be an 'outgrowth' of the employment [citation]; the risk of tortious injury must be ' "inherent in the working environment" ' [citation] or ' "typical of or broadly incidental to the enterprise [the employer] has undertaken" ' [citation.]." (*Ibid.*) Similarly, the risk that employees will commit intentional torts of the type for which liability is sought must be predictably created by the employment. (*Id.* at p. 299.) That is to say, the employee's conduct must not be " 'so unusual or startling [in the context of the employment] that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Ibid.*)

■ Our Supreme Court has stated that sexual assaults are not per se beyond the scope of every employment. (*Lisa M., supra*, 12 Cal.4th at p. 300.) However, as with other assaults, "a sexual tort will not be considered engendered by the employment unless its motivating emotions were fairly attributable to work-related events or conditions." (*Id.* at p. 301.) If the injury is inflicted out of personal malice or compunction, not engendered by or connected to the employment, in other words if the tort is personal in nature, there is no vicarious liability. (*Farmers Ins. Group, supra*, 11 Cal.4th at pp. 1005-1006.) Still, the Supreme Court has also observed, in a survey of California cases, that with the exception of cases involving sexual misconduct by on-duty police officers against members of the public, employers have not been held vicariously liable for the sexual wrongdoing of their employees. (*Id.* at pp. 1006-1007.) While that survey was completed in 1995, our own review of subsequent cases reveals that the Supreme Court's observation still holds true. (See, e.g., *Maria D. v. Westec Residential Security, Inc., supra*, 85 Cal.App.4th 125; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 [97 Cal.Rptr.2d 12]; *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023 [75 Cal.Rptr.2d 777].)

■ It is not a simple task to determine whether Ayala's personal motivations were generated by, or were an outgrowth of, his workplace responsibilities, conditions or events. Dr. Gilbert Kliman (Dr. Kliman), a psychiatrist, testified that the phenomena of transference and countertransference are normal and desirable components of the treatment at residential facilities. Transference occurs when a child develops affection for and begins confiding in the members of the therapeutic team. In this way the team allows the child to transfer parent/child relationship elements to them so that they can be reworked into healthy behaviors for the child. Countertransference entails the feelings of the team towards the child. Dr. Kliman believes that there was a very strong transference relationship between John Y. and Ayala. He also believes that Ayala's relationship with Adam M. showed him to be predisposed to transference relationships, and John Y.'s status as a needy child made the relationship predictable. He testified that Ayala became overwhelmed by his employment activity of getting involved with John Y. and lost control of himself. However, he also testified that when the transference relationship "becomes erotic or sexual, that's a different matter."

Certainly, the circumstances of this case render the determination a much closer call than other situations with which the courts have grappled. Nevertheless, we find that as with teachers or scout leaders, the authority conferred upon Ayala to carry out his duties as a teacher's aide and residential counselor, and the abuse of that authority to indulge in personal sexual wrongdoing is too attenuated to permit a trier of fact to view his sexual assaults as within the risks allocable to his employer. Ayala's acts of sodomy were undertaken solely for his personal gratification and had no purpose connected to his employment. Further, while, with the benefit of hindsight, certain of his actions that may now appear questionable might have been engendered by events or conditions relating to employment duties or tasks, those deeds are not the actionable conduct for which vicarious liability is sought to be imposed. Thus, we conclude that the trial court did not err when it refused to issue jury instructions related to Defendants' vicarious liability for Ayala's sexual misconduct.

■ John Y. urges that Ayala was in the position of a therapist, and because of the transference phenomenon, his sexual misconduct was therefore foreseeable so as to give rise to respondeat superior liability. He cites *Waters v. Bourhis* (1985) 40 Cal.3d 424 [220 Cal.Rptr. 666, 709 P.2d 469] (*Waters*) and *Richard H. v. Larry D.* (1988) 198 Cal.App.3d 591 [243 Cal.Rptr. 807] (*Richard H.*) for that proposition. In the first instance, despite the fact that he was part of the therapeutic team, there is no evidence to support that Ayala was a licensed psychotherapist as the cases on this point require. (See, e.g., *Jacqueline R. v. Household of Faith Family Church, Inc.*

(2002) 97 Cal.App.4th 198 [118 Cal.Rptr.2d 264]; *Gromis v. Medical Board* (1992) 8 Cal.App.4th 589, 595-596 [10 Cal.Rptr.2d 452].) Further, neither of the cited cases supports John Y.'s argument.

In *Waters, supra,* 40 Cal.3d 424, the court recognized that a psychiatrist might be held liable for professional malpractice for mishandling the transference phenomenon resulting in sexual assault of a patient. (*Id.* at pp. 433-434.) It did not involve any recognition that such mishandling of transference was foreseeable. In *Richard H., supra,* 198 Cal.App.3d 591, the court did not hold that it was foreseeable that a psychiatrist would have a sexual affair with a woman seeing him for marriage counseling; it held that it was foreseeable that her husband would suffer injury from the psychiatrist's conduct if he discovered it. (*Id.* at pp. 595-596.) As in *Waters,* the court concluded that the psychiatrist's actions could constitute professional malpractice. (*Richard H., supra,* 198 Cal.App.3d at pp. 595-596.) The court did not conclude that the psychiatrist had acted in the course and scope of his employment when he engaged in a sexual relationship with a client. Rather, it merely observed that the plaintiff husband had so alleged, and his complaint was therefore sufficient to survive demurrer. (*Id.* at p. 596.)

John Y. argues that Dr. Kliman's testimony that the transference relationship between residents and staff is encouraged provides sufficient evidence to allow the jury to decide whether sexual molestation naturally arises out of the association between residents and staff at care facilities. The argument does not hold up. The transference relationship is designed to replace the parent with the facility staff in the mind of the child. Thus, it makes no more sense to conclude that sexual molestation arises out of a staff/resident relationship based upon this testimony than it does to conclude that such acts are a normal and foreseeable part of the parent/child relationship.

■ John Y. also argues that he presented evidence that sexual assaults by staff on residents at group homes is foreseeable, and therefore not "unusual or startling," because molestations had occurred at such facilities before and were statistically more likely in such settings. However, "[t]he question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Lisa M., supra,* 12 Cal.4th at p. 302.) In the view of decent society, it most certainly remains both unusual and startling for a residential counselor/teacher's aide to sodomize an emotionally disturbed child whom he supervises. From this perspective it seems unfair to include the loss resulting from such a heinous and shocking crime among the losses to be expected from the operation of a

residential facility. We find that the Indiana and Minnesota cases that John Y. cites in support of his position on these points are contrary to the weight of California authority and are therefore not persuasive.[1]

B.   *Apportioning Damages Was Not Error*

■  John Y. contends that because the jury found that Defendants had violated licensing regulations, which constitutes a breach of a nondelegable duty, there should have been no apportionment of fault among the Defendants and Ayala for the payment of noneconomic damages. He cites *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284 [65 Cal.Rptr.2d 872, 940 P.2d 323] (*CAHF*), and *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721 [28 Cal.Rptr.2d 672] (*Srithong*) in support of his assertion that Proposition 51 (Civ. Code, § 1431 et seq.) rules regarding apportionment of noneconomic damages do not apply in this case because Defendants could not delegate to Ayala their mandatory duties under Title 22. He concludes that Defendants are therefore responsible for all of Ayala's acts. Clearly this is an attempt to circumvent the fact that Defendants cannot be held vicariously liable to John Y. for Ayala's tortious acts.

*CAHF*, *supra*, 16 Cal.4th 284, involved licensing regulations and citations under the Long-Term Care, Health, Safety, and Security Act of 1973. (Health & Saf. Code, § 1417 et seq.) John Y. has not shown that the facilities operated by Defendants fall within this act, or that they are covered by one substantially similar. Even assuming that the holding in *CAHF* would extend to cover facilities such as those operated by Defendants, the case would stand for the proposition that employers such as the Defendants are responsible for the acts of their employees so far as state licensing regulations are concerned. In other words, an employer may not avoid citation and any attendant penalties under the licensing regulations by claiming that the allegedly wrongful acts were done by an employee. (*CAHF*, *supra*, 16 Cal.4th at pp. 288, 294-299.) The court itself recognized that employer responsibility in the context of enforcing regulations and issuing citations is not the equivalent of employer responsibility in the context of a third party civil suit for tort damages. (*Id.* at pp. 295, fn. 5, 301-302, 305.) We are not convinced that a duty that is nondelegable insofar as complying with licensing regulations is also nondelegable in the sense that an employer will be held vicariously liable in tort for all of the acts of its employees. Certainly *CAHF*, *supra*, 16 Cal.4th 284, does not stand for that proposition. Thus, it is not particularly supportive of John Y.'s claim.

[1]*Stropes v. Heritage House Childrens Center of Shelbyville, Inc.* (Ind. 1989) 547 N.E.2d 244; *Fahrendorff v. North Homes, Inc.* (Minn. 1999) 597 N.W.2d 905.

In citing *Srithong, supra,* 23 Cal.App.4th 721, John Y. assumes that Defendants' duties were nondelegable for purposes of tort liability as well as for licensing, a proposition for which he has presented no authority, as noted above. Further, even if that were the case, John Y. also assumes that the delegation of duty doctrine discussed in *Srithong,* which involved a lessor's delegation of a mandatory duty to a third party independent contractor, applies equally to situations where an employee does an act on behalf of his or her employer. Again, he provides no authority for this proposition.

One of John Y.'s expert witnesses, Carlos Sosa, testified that Defendants' employees were hired, trained and supervised by them, and were "not free agents" or subcontractees. Therefore, it cannot be said that here there was a delegation of duty similar to that in *Srithong* or in other cases where the doctrine of nondelegable duty has been applied to establish vicarious liability for negligent acts. (See, e.g., 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1017, p. 410.) Indeed, the doctrine of nondelegable duty is parallel to that of respondeat superior, as both are forms of vicarious liability. Both have the aim of ensuring that the employer is responsible to innocent third parties for the negligent acts of its agents. (*Ibid.; Perez v. Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 967; *Srithong, supra,* 23 Cal.App.4th at pp. 726-727.) They apply the same rule, but in different contexts.

Here Ayala was not an independent contractor but was Defendants' employee. Therefore, Defendants are liable for his acts that violated the law only so long as those acts were done in the course and scope of his employment. John Y. cannot avoid this fact, and circumvent this rule by claiming that there can be no apportionment of noneconomic damages under the doctrine of nondelegable duties.

Further, even if we overlooked the problems with John Y.'s argument discussed herein, we could not, in this case, apply the rule that he proposes. Insofar as Ayala might have committed acts that were both in the course and scope of his employment and that also constituted a basis for the finding that Defendants had violated regulations under Title 22, the jury was not requested to make an apportionment between those acts for which Defendants might be vicariously liable and those acts for which they are not. It is inconceivable that the 30 percent fault attributed to Ayala bears no relation whatsoever to those acts that were outside the course and scope of his employment. Thus, there is no way of properly allocating the noneconomic damages as John Y. requests. ■ His failure to request modification of the special verdict form results in his waiver of any claim that it was insufficient to enable the findings he desired. (*Brown v. Regan* (1938) 10

Cal.2d 519, 523-524 [75 P.2d 1063]; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 960-962 [17 Cal.Rptr.2d 242].) The trial court did not err in apportioning noneconomic damages according to fault.

C. *Granting JNOV on the Issue of Punitive Damages Was Not Error*

   1., 2.*

· · · · · · · · · · · · · · · · · · · · · · · · · ·

### DISPOSITION

The judgment is affirmed. Defendants to recover their costs on appeal.

Richli, J., and Ward, J., concurred.

A petition for a rehearing was denied September 17, 2002, and the petition of appellant John Y., Jr., for review by the Supreme Court was denied December 18, 2002. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 565.