CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARISOL LOPEZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GLENN LEDESMA et al.,<br><br>    Defendants and Appellants;<br><br>BERNARD KOIRE,<br><br>    Defendant and Respondent. | B284452<br><br>(Los Angeles County<br>Super. Ct. No. BC519180) |

APPEALS from a judgment of the Superior Court of Los Angeles County. Lawrence P. Riff, Judge. Affirmed.

Esner, Chang & Boyer, Stuart Esner; Law Office of Neil M. Howard and Neil M. Howard for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson and Zena Jacobsen for Defendants and Appellants Glenn Ledesma, Suzanne Freesemann and Brian Hughes.

Prindle, Goetz, Barnes & Reinholtz, Jack R. Reinholtz and Douglas S. de Heras for Defendant and Respondent.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association, California Hospital Association, California Academy of Physician Assistants and the American Medical Association as Amici Curiae on behalf of Defendants and Appellants and Defendant and Respondent.

—————————————————

Marisol Lopez (Lopez) appeals from a portion of a judgment in her favor that reduced the damages she was awarded for the wrongful death of her daughter, Olivia Sarinanan (Olivia).[1] Olivia died from malignant melanoma when she was about four years old. Lopez prevailed in her negligence claims against three doctors and two physician assistants. The trial court awarded noneconomic damages of $4.25 million, but reduced those damages to $250,000 pursuant to Civil Code section 3333.2, subdivision (b).[2]

Lopez argues that the reduction in damages was improper because the conduct of the two physician assistants who treated Olivia—Suzanne Freesemann and Brian Hughes—fell within a proviso excluding certain conduct from the statutory damages

---

[1] Lopez originally filed this action before Olivia died. After Olivia's death, Lopez amended the complaint, asserting a wrongful death claim.

[2] Subsequent undesignated statutory references are to the Civil Code.

2

reduction. Lopez relies on section 3333.2, subdivision (c)(2), which provides that noneconomic damages against a health care provider for negligent professional services is limited to $250,000 "provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." Lopez argues that the negligence of the physician assistants is included within the scope of this proviso because the physician assistants acted without the supervision of a physician in violation of the governing statutes and regulations.

We reject the argument and affirm. Our Legislature has not given clear direction on how to apply section 3333.2, subdivision (c)(2) to physician assistants, whose situation is somewhat unique. The scope of a physician assistant's practice is defined, not by the physician assistant license itself, but by the scope of the practice of the physician who supervises them. In this case, the physician assistants had a nominal, but legally enforceable, agency relationship with supervising physicians, but received little to no *actual* supervision from those physicians.

In the absence of any clear legislative statement on the issue, we conclude that a physician assistant acts within the scope of his or her license for purposes of section 3333.2, subdivision (c)(2) if he or she has a legally enforceable agency agreement with a supervising physician, regardless of the quality of actual supervision. A contrary rule would make the damages reduction in section 3333.2 dependent on the adequacy of supervision. Such a rule would be uncertain and difficult to define, and would contravene the purpose of section 3333.2 to encourage predictability of damages to reduce insurance premiums.

## BACKGROUND

### 1.    Law Governing Physician Assistants

The Legislature established the position of physician assistant out of "concern with the growing shortage and geographic maldistribution of health care services in California." (Bus. & Prof. Code, § 3500.)[3]  Its purpose in doing so was to encourage the "effective utilization of the skills" of physicians by enabling them to  work with physician assistants.  (*Ibid.*) A physician assistant must pass a licensing examination after completing an approved program and must practice under the supervision of a supervising physician.  (Bus. & Prof. Code, §§ 3502, 3519.)[4]  Under the governing regulations, the scope of

___

[3] The Legislature enacted the current Physician Assistant's Practice Act in 1975 (the Act).  (Stats. 1975, ch. 634, § 2, p. 1371.) It replaced the Physician's Assistant Law, which the Legislature enacted in 1970 with the same legislative purpose.  (Stats. 1970, ch. 1327, § 2, p. 1327.)

[4] A number of relevant sections in the Business and Professions Code were amended effective January 1, 2020, pursuant to Senate Bill No. 697 (2019–2020 Reg. Sess.) (SB 697). (See Stats. 2019, ch. 707.)  We apply the law as it existed at the time of the relevant events.  Thus, citations in this opinion are to the prior versions of the relevant statutes, effective until January 1, 2020.  To avoid confusion, we use the present tense in identifying the relevant provisions of law, even if those provisions have now been altered by amendment, and we note the changes made by those amendments where appropriate.

The source of SB 697 was the California Academy of Physician Assistants.  (See Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 697 (2019–2020 Reg. Sess.) as amended Apr. 24, 2019, p. 1.)  The legislative

4

services a physician assistant is permitted to provide is defined primarily through the physician assistant's relationship with his or her supervising physician.  "A physician assistant may only provide those medical services which he or she is competent to perform and which are consistent with the physician assistant's education, training, and experience, and which are delegated in writing by a supervising physician who is responsible for the patients cared for by that physician assistant."  (Cal. Code Regs.,

---

history reflects that a primary purpose of the bill was to "align the supervisory and practice environments" between nurse practitioners and physician assistants to "create a level hiring field."  (*Id.* at p. 6.)  To that end, the bill "[r]evises the Act's Legislative intent to strike references to [physician assistants'] delegated authority and instead emphasizes coordinated care between healthcare professionals."  (*Id.* at p. 2.)  The bill also eliminated a number of mandated supervisory procedures, leaving the details of supervision to a practice agreement.  (*Id.* at pp. 1–2.)

We need not, and do not, attempt to analyze the effect of the specific amendments that SB 697 implemented.  However, we note that the bill does not affect the basic structure of the physician/physician assistant relationship as is relevant to this opinion.  Under the amended statutes, a physician assistant is still required to render services "under the supervision of a licensed physician," and such supervision means that the licensed physician "accepts responsibility for" the medical services that a physician assistant provides.  (Bus. & Prof. Code, §§ 3501, subd. (f), 3502, subd. (a)(1).)

The amendments in SB 697 further highlight the need for legislative guidance in understanding the relationship between the Act and the damage limitation in section 3333, subdivision (c)(2).

5

tit. 16, § 1399.540, subd. (a).)  During the relevant time period, the formal writing defining the services a physician assistant may perform was called a "delegation of services agreement" (DSA).  (Cal. Code Regs., tit. 16, § 1399.540, subd. (b).)[5]

## 2.  Olivia's Disease and Treatment

No party disputes the trial court's factual findings, and we therefore rely on the trial court's statement of decision to summarize the pertinent facts.

Olivia was born in late 2009.  When she was about seven or eight months old, she developed a spot on her scalp.  Her primary care physician referred Olivia's mother, Lopez, to a dermatology clinic owned by Dr. Ledesma.

Freesemann worked as a physician assistant at the clinic. She saw Olivia on December 8, 2010, and after that visit requested approval from the insurer for an "excision and biopsy."

Hughes, who also worked at the clinic as a physician assistant, saw Olivia again on January 3, 2011, and performed a "shave biopsy" of the scalp lesion.  The doctor who examined the biopsied tissue found no malignancy.[6]  Hughes saw Olivia again

---

[5] Under current law, the governing agreement is now called a "practice agreement."  (Bus. & Prof. Code, § 3501, subd. (k).) However, references to a delegation of services agreement in any other law "shall have the same meaning as a practice agreement."  (*Ibid.*)  And a delegation of services agreement in effect prior to January 1, 2020, is deemed to satisfy the current requirements for a practice agreement.  (Bus. & Prof. Code, § 3502.3, subd. (a)(3).)

[6] The court found for the examining doctor, Soeprono, on Lopez's negligence claim against him.

6

on January 17, 2011, noted that the biopsy wound was healing well, and told Lopez that there was nothing to worry about.

That spring and early summer Lopez noticed that the lesion was growing back.  She returned to the Ledesma clinic in June and saw Freesemann.  Freesemann assessed the new growth as "warts" and requested authorization to burn off the growth with liquid nitrogen.  Lopez returned with Olivia on July 27 to have the growth removed.

Lopez returned to the clinic again on September 9 after observing that the lesion was "bigger, darker and not uniform in color."  Hughes examined Olivia and concluded again that the growth was warts.  He referred Lopez to a general surgeon to have the growth removed.  Dr. Koire reviewed and countersigned the chart note from this visit several months later.

A general surgeon excised the lesion on December 23, 2011, and provided the tissue to a pathologist, Dr. Pocock.  Pocock did not find any malignancy.[7]

In early 2013 Olivia developed a bump on her neck and began to complain of neck pain.  The surgeon removed the neck mass and referred Lopez to an oncologist at Children's Hospital of Los Angeles.  The oncologist diagnosed metastatic malignant melanoma.  Olivia died in early 2014, when she was a little over four years old.

---

[7] The trial court found that Pocock was negligent in this analysis.

### 3. The DSA's concerning Freesemann and Hughes

#### A. *Freesemann*

Prior to 2010, Marshall Goldberg, a dermatologist, practiced with Ledesma. Freesemann had an unsigned and undated DSA with Goldberg, but by the time of the relevant events Goldberg was no longer affiliated with any Ledesma facility and Freesemann knew that Goldberg was not her supervising physician. The trial court found that Freesemann's DSA with Goldberg "may never have been valid but certainly was not at the time of [Freesemann's] clinical encounters with Olivia."

Freesemann also had a DSA with Ledesma dated January 1, 2009. The DSA was never revoked, and thus the trial court found that it was "nominally" in effect during Freesemann's visits with Olivia.

Ledesma testified that he had become disabled and unable to practice medicine in 2010. He denied that he was Freesemann's supervising physician; he claimed that Dr. Koire performed that role. Freesemann and Koire disputed that claim and testified that Ledesma was Freesemann's supervising physician.

#### B. *Hughes*

Hughes had a signed DSA with Koire. Although the DSA was undated, the trial court found that the DSA created a physician assistant/supervising physician relationship between Hughes and Koire. Hughes and Koire both testified that they had such a relationship.

### 4. Lack of Supervision of Freesemann and Hughes

#### A. *Freesemann*

Despite his formal DSA with Freesemann, Ledesma was not actually fulfilling any supervisory responsibilities during the

8

relevant events. Ledesma had "removed himself from the practice of medicine." The court also found it "highly likely if not certain that Ms. Freesemann knew that Dr. Ledesma was not fulfilling his statutory obligations."

The court found that Ledesma breached his supervisory obligations imposed by the governing regulations by: (1) failing to be available in person or electronically for consultation; (2) failing to select for review charts on cases that presented the most significant risk to the patient; and (3) failing to review and countersign within 30 days a minimum 5 percent sample of medical records.

The court found that Freesemann breached her regulatory obligations by failing to operate under required supervisory guidelines, which the court found were likely not even in existence. Freesemann also failed to consult with a physician regarding tasks and problems that she determined exceeded her level of competence. Indeed, the court found that Freesemann "consulted with no physician affiliated with the Ledesma clinics on any topic at all." Freesemann was "acting autonomously and knew it."

## B. *Hughes*

The court found that Koire was not available at all times for consultation when Hughes was seeing patients. The court also found it likely that Hughes knew Koire was not meeting his obligations to select difficult cases for chart review and reviewing a sample of at least 5 percent of cases within 30 days. In fact, Koire had had a stroke before meeting Hughes and was "no longer engaged in active practice."

Hughes also did not operate under required supervisory guidelines. The court concluded that Hughes "engaged in his

practice of dermatology without adequate . . . supervision." The court found it likely that Hughes knew he was "functioning autonomously."

### 5. Liability and Damages

The case was tried to the court over 14 days. The trial court found in favor of Lopez on her negligence claims against Freesemann and Hughes. The court found that their conduct fell below the standard of care in a number of respects concerning the failure to take adequate steps to diagnose Olivia's condition and to seek guidance from a physician.

The court found that Ledesma and Koire were derivatively liable for the physician assistants' negligence on an agency theory. The court based its finding on several grounds. First, the court concluded that the DSA's established a contractual agency relationship. The DSA's recited that their purpose was to "delegate the performance of certain medical services" to the physician assistants and identified the supervising physician as "responsible for the Patients cared for by" the physician assistant.[8]

Second, the court concluded that the governing regulations created an agency relationship. The court relied upon regulations, discussed further below, that explicitly state that a physician assistant acts as an agent of the supervising physician, and that the supervising physician has continued responsibility for patients that the physician assistant sees.

---

[8] The parties did not include the DSA's themselves in the appellate record. The quoted language is cited in the trial court's statement of decision.

Finally, the court concluded that Ledesma was liable under an ostensible agency theory because he created the impression that Hughes and Freesemann were acting under his direction.

The court also found in favor of Lopez on her negligence claim against Pocock.[9]

The court awarded Lopez economic damages in the amount of $11,200, and noneconomic damages of $4.25 million. Pursuant to section 3333.2, subdivision (b), the trial court reduced the noneconomic damages to $250,000. The trial court concluded that Lopez's claims did not fall within the proviso in section 3333.2, subdivision (c)(2). The court rejected the argument that the physician assistants violated licensing restrictions by failing to comply with the governing regulations. The court concluded that the language in the proviso excluding conduct that violates a licensing restriction applies only to a "particularized restriction previously imposed" by the licensing agency.

## DISCUSSION

### 1. Standard of Review

The sole issue on these appeals is whether the limitation on the amount of damages for noneconomic losses in medical malpractice actions under section 3333.2 applies to an action against a physician assistant who is only nominally supervised by a doctor. Because this is a purely legal issue, we review it

---

[9] Lopez did not appeal from the judgment with regard to Pocock. However, Pocock filed a respondent's brief on September 6, 2018. Pursuant to Lopez's request, Pocock was dismissed from the appeal on October 9, 2019.

11

de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)**10**

2. **The Limitation on Noneconomic Damages in Section 3333.2 Applies to an Action for Professional Negligence Against a Physician Assistant Who Has a Legally Enforceable Agency Relationship with a Supervising Physician**

A. ***The limitation on noneconomic damages under the Medical Injury Compensation Reform Act (MICRA)***

The Legislature enacted MICRA in 1975 (Stats. 1975, Second Ex. Sess. 1975–1976, chs. 1, 2, pp. 3949–4007) to address "serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums." (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363.) The rapid increase in the cost of medical malpractice insurance was "threatening to curtail the availability of medical care in some parts of the state and creating the very real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments." (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 158 (*Fein*).) To meet this problem, the Legislature enacted a

_____

**10** Because of our resolution of this issue, we do not consider defendants' appeal. Defendants brought that appeal conditionally, to be considered only in the event we reverse the trial court's ruling that the damages limitation in section 3333.2 applies.

12

number of different provisions "affecting doctors, insurance companies and malpractice plaintiffs." (*Id.* at p. 159.)

One of those provisions is the limitation on noneconomic damages in section 3333.2. "One of the problems identified in the legislative hearings [preceding MICRA] was the unpredictability of the size of large noneconomic damage awards, resulting from the inherent difficulties in valuing such damages and the great disparity in the price tag which different juries placed on such losses." (*Fein, supra,* 38 Cal.3d at p. 163.) Section 3333.2 addressed that problem by imposing a cap on such damages.

Civil Code section 3333.2 states that, in any action for "injury against a health care provider based on professional negligence," the noneconomic damages that an injured plaintiff may recover are limited to $250,000. (Civ. Code, § 3333.2, subds. (a) & (b).) A "health care provider" includes any person who is licensed under division 2 of the Business and Professions Code (which includes physician assistants). (Bus. & Prof. Code, §§ 3500–3546.)

Section 3333.2 defines "professional negligence" as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, *provided that* such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 3333.2, subd. (c)(2), italics added.)

Our Supreme Court interpreted an identical proviso in *Waters v. Bourhis* (1985) 40 Cal.3d 424 (*Bourhis*). The plaintiff in that case (Waters), a former client of the defendant attorney, claimed that MICRA's limitation on the amount of contingent

13

attorney fees contained in Business and Professions Code section 6146 applied to the attorney's fee in a prior case in which the attorney had represented Waters. The prior case was an action against Waters's former psychiatrist based upon allegations that the psychiatrist had exploited his professional relationship with Waters to engage in sexual conduct with her. The case settled before trial, and the attorney retained a higher percentage of the settlement amount than he would have been entitled to retain if the action were covered by the MICRA contingent fee limitation. The trial court granted summary judgment in favor of the attorney, concluding that " 'most of the damage was outside the scope of professional negligence under which the attorney's fee is limited.' " (*Id.* at 431.)

One of the attorney's arguments on appeal was that the summary judgment could be sustained on the ground that the proviso in the definition of professional negligence in Business and Professions Code section 6146 (which is identical in substance to the definition in Civil Code section 3333.2) meant that the prior action was not for professional negligence. The attorney argued that the psychiatrist's misconduct was outside a " 'restriction imposed by the licensing agency' " because sexual misconduct was a basis for disciplinary action against the psychiatrist. (*Bourhis*, *supra*, 40 Cal.3d at pp. 435–436.)

The Supreme Court rejected the argument. The court explained that, "[i]n our view, this contention clearly misconceives the purpose and scope of the proviso which obviously was not intended to exclude an action from section 6146—or the rest of MICRA—simply because a health care provider acts contrary to professional standards or engages in one of the many specified instances of 'unprofessional conduct.'

14

Instead, it was simply intended to render MICRA inapplicable when a provider operates in a capacity for which he is not licensed—for example, when a psychologist performs heart surgery." (*Bourhis, supra,* 40 Cal.3d at p. 436.) The court concluded that the psychiatrist's conduct "arose out of the course of the psychiatric treatment he was licensed to provide." (*Ibid.*)[11]

The court in *Prince v. Sutter Health Central* (2008) 161 Cal.App.4th 971 (*Prince*) applied this interpretation of the proviso in concluding that a social worker did not act outside the scope of a "restriction imposed by the licensing agency" while working toward her licensure under supervision. The court held that the social worker was a "health care provider" under Civil Code section 3333.2 because she was lawfully practicing under a

_____

[11] The trial court here concluded that this discussion in *Bourhis* was dicta. We disagree. The court in *Bourhis* ultimately held that the MICRA limitation on contingent attorney fees did not apply to a recovery that "may be based on a non-MICRA theory" (such as the theory of intentional tortious conduct alleged against the psychiatrist) and remanded the case for the trial court to consider whether the attorney had received appropriate informed consent from Waters to file a hybrid MICRA/non-MICRA action. (*Bourhis, supra,* 40 Cal.3d at pp. 437–438.) There would have been no need to remand the case for that determination if the court had interpreted the proviso in the manner the defendant attorney urged. Thus, the court's holding on the scope of the proviso was a ground for its ultimate decision. In any event, even if the court's conclusion was dicta, our Supreme Court's dicta is "highly persuasive," and we will generally follow it unless there is a compelling reason not to do so. (See *Gonzalez v. Mathis* (2018) 20 Cal.App.5th 257, 272, fn. 1.) We see no such reason here.

registration permitting her to practice under supervision while working toward licensure. (*Id.* at pp. 974, 977.) The court rejected the argument that the social worker acted outside the scope of a "restriction" on her ability to practice because she violated an obligation to disclose that she was " 'unlicensed and . . . under the supervision of a licensed professional.' " (*Id.* at p. 977, quoting Bus. & Prof. Code, § 4996.18, subd. (h).) The court held that: (1) the disclosure statute was not "imposed by" the licensing agency as stated in the proviso; and (2) the Supreme Court rejected a similar claim in *Bourhis.* Thus, consistent with *Bourhis,* the court in *Prince* concluded that the social worker's violation of a statutory professional standard did not mean she was acting outside the scope of a licensing restriction for purposes of the damages limitation in Civil Code section 3333.2.[12] (*Prince*, at pp. 977–978.)

---

[12] The court also rejected the argument that the social worker was not " 'receiving the supervision required by law.' " (*Prince, supra,* 161 Cal.App.4th at p. 977.) The argument was apparently based on evidence showing that she was receiving group rather than individual supervision. The court concluded that the type of supervision did not "change the nature of the services" that the social worker provided. (*Id.* at p. 978) The court did not explain that conclusion, and it is therefore unclear whether the court intended to address the issue that we face here, i.e., whether inadequate supervision means that a licensed professional required by law to act under supervision is practicing outside the scope of a licensing restriction.

16

**B.** *The damages limitation as applied to physician assistants*

**1.** *The nature of the problem*

Applying the limitation on damages in section 3333.2 to physician assistants presents a unique difficulty. Unlike, for example, the psychologist that our Supreme Court mentioned in *Bourhis,* who clearly is not licensed to perform heart surgery, a physician assistant's area of practice is not just defined by the license that he or she receives.[13] Rather, it is primarily defined by his or her supervising physician. A physician assistant is permitted to practice in the area in which the supervising physician practices, performing those tasks that the supervising physician delegates. (Cal. Code Regs., tit. 16, § 1399.545, subd. (b) ["A supervising physician shall delegate to a physician assistant only those tasks and procedures consistent with the

---

[13] As counsel for amici pointed out at oral argument, the governing law does identify some situations in which a physician assistant would clearly act outside the "scope of services for which the provider is licensed." (Civ. Code, § 3333.2, subd. (c)(2).) For example, Business and Professions Code section 3502, subdivision (d) states that the law governing physician assistants does not authorize them to perform medical services in several fields, including dentistry and optometry. And California Code of Regulations, title 16, section 1399.541 lists many medical tasks that physician assistants may perform, but does not include in that list surgical procedures requiring general anesthesia performed outside the presence of a supervising physician. (Cal. Code Regs., tit. 16, § 1399.541, subd. (i)(1).) A physician assistant who performs such unauthorized tasks would be analogous to the psychologist who performs heart surgery.

17

supervising physician's specialty or usual and customary practice and with the patient's health and condition"].)  Thus, a physician assistant's practice area is potentially as broad as that of any physician.

But, by the nature of his or her role as an *assistant*, a physician assistant's practice is limited in a way that a physician's is not.  Clearly, a physician assistant is not permitted to practice without supervision.  Business and Professions Code section 3502 permits physician assistants to perform medical services only when the services are rendered "under the supervision of a licensed physician and surgeon."  (Bus. & Prof. Code, § 3502, former subd. (a), now subd. (a)(1).)  The question for purposes of the damages limitation in Civil Code section 3333.2 is what "under the supervision of" means in this context.[14]

_____

[14] As the dissent points out, Business and Professions Code section 3501 states that, for purposes of the chapter governing physician assistants, the term "supervision" means that "a licensed physician and surgeon oversees the activities of, and accepts responsibility for, the medical services rendered by a physician assistant."  (Bus. & Prof. Code, § 3501, former subd. (6), now subd. (f)(1).)  As amended by SB 697, this definition is even more specific, requiring that the supervising physician be available by telephone or other electronic communication during a patient examination and requiring "[a]dherence to adequate supervision as agreed to in the practice agreement."  (Bus. & Prof. Code, § 3501, subd. (f)(1)(A).)  Thus, a supervising physician clearly undertakes the obligation to "oversee" the medical services provided by a physician assistant.  However, for the reasons discussed below, we do not agree that the existence of this obligation means that a physician assistant acts outside the scope of his or her license whenever the obligation is not met.

18

It seems clear that a physician assistant who practices without any relationship at all with a supervising physician would be practicing "outside the scope of services for which the provider is licensed." (§ 3333.2, subd. (c)(2).) Without such a relationship, the physician assistant would have no delegated tasks that he or she is authorized to perform. (See Cal. Code Regs., tit. 16, § 1399.540, subd. (a).)

However, where, as here, a physician assistant establishes a legal relationship with a supervising physician through a DSA, but in practice receives no supervision, is the physician assistant practicing outside the scope of licensed services or in violation of a "restriction imposed by the licensing agency"? If so, any negligent medical care that the physician assistant provides is not "professional negligence" under section 3333.2, subdivision (c)(2), and the limitation on noneconomic damages in that section does not apply. If not, then the physician assistant's negligence is "professional negligence" to which the MICRA damages limitation applies.

Our Legislature has not provided an answer to this question, which raises policy issues that the Legislature is best equipped to consider. However, in the absence of clear legislative direction, we must do our best to apply the statute based upon the Legislature's probable intent. We must construe section 3333.2 in this context in a manner that "comports most closely with the apparent intent of the Legislature, with a view to

---

Doing so would conflict with the purpose of section 3333.2 and would lead to results that the Legislature would not have intended.

19

promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)

### 2. *The significance of an agency relationship*

For the reasons discussed below, we conclude that the presence of a legal agency relationship between a physician assistant and a supervising physician is the dispositive factor in determining whether the physician assistant was acting outside the scope of licensed services for purposes of section 3333.2, subdivision (c)(2). If an otherwise qualified physician assumes the legal responsibility of supervising a physician assistant, that physician assistant practices within the "scope of services" covered by the supervising physician's license, even if the supervising physician violates his or her obligation to provide adequate supervision.

First, the regulatory scheme suggests that the supervising physician, not the physician assistant, is the relevant "health care provider" for purposes of determining whether particular services are within the scope of a license under Civil Code section 3333.2. The supervisory physician is tasked with the responsibility to "delegate to a physician assistant only those tasks and procedures consistent with the supervising physician's specialty or usual and customary practice." (Cal. Code Regs., tit. 16, § 1399.545, subd. (b).) Moreover, once a supervisory relationship is established, the physician assistant acts as the

20

agent of the supervising physician.[15]  The regulations go so far as to state that the acts of the physician assistant are deemed to be the acts of the supervising physician:  "Because physician assistant practice is directed by a supervising physician, and a physician assistant acts as an agent for that physician, the orders given and tasks performed by a physician assistant shall be considered the same as if they had been given and performed by the supervising physician."  (Cal. Code Regs., tit. 16, § 1399.541.) Thus, once a physician undertakes to supervise a physician assistant and forms an agency relationship with the assistant, the scope of the supervising physician's license (and any restrictions on it) define the tasks that the assistant may perform.

Second, a standard for determining whether a physician assistant is acting outside the scope of his or her license that is based on the *adequacy* of supervision rather than the *legal responsibility* to supervise would make the MICRA damages

---

[15] At the time of the relevant events, former Business and Professions Code section 3501, subdivision (b) specifically stated that a physician assistant "acts as an agent of the supervising physician when performing any activity authorized by this chapter or regulations adopted under this chapter."  Senate Bill No. 697 deleted that provision, and instead implemented a new section providing in part that "[a] practice agreement may designate a [physician assistant] as an agent of a supervising physician and surgeon."  (Bus. & Prof. Code, § 3502.3, subd. (a)(4).)  The intent of this change is unclear.  Under the amended law, supervision still means that the supervising physician "accepts responsibility for" the medical services provided by a physician assistant.  (Bus. & Prof. Code, § 3501, subd. (f).)

limitation dependent on whether a supervising physician acts contrary to professional standards. The regulations impose a variety of specific supervisory responsibilities on a supervising physician, including the responsibility to: (1) be available in person or electronically when the assistant is caring for patients; (2) determine the physician assistant's competence to perform the designated tasks; (3) establish written guidelines for supervision that address patient examination by the supervising physician, countersignature on medical records, and detailed protocols for medical tasks; (4) review a sample of medical records of patients that a physician assistant treats; and (5) follow the progress of patients and "make sure that the physician assistant does not function autonomously." (Cal. Code Regs., tit. 16, § 1399.545, subds. (a), (c), (e) & (f).) Violation of these regulations by a supervising physician can constitute unprofessional conduct leading to limitations on the right to supervise a physician assistant. (Bus. & Prof. Code, § 3527, subd. (c).)[16]

A rule that would exclude a physician assistant's conduct from the damages limitation in MICRA simply because a supervising physician violates some or all of the governing regulations would contravene our Supreme Court's decision in *Bourhis* that conduct is not outside the scope of a license merely because it violates professional standards. (See *Bourhis, supra,* 40 Cal.3d at p. 436.) As mentioned, the court in *Prince* similarly

_____

[16] We take no position as to whether or not this consequence or any other discipline for unprofessional conduct would be appropriate for the supervising physicians here. (See Bus. & Prof. Code, § 2234 [identifying unprofessional conduct, including gross negligence and "repeated negligent acts"].)

22

concluded that, under the analysis in *Bourhis*, a social worker's violation of a statute requiring her to disclose that she was unlicensed and acting under supervision did not mean she was acting outside the scope of a license restriction. (See *Prince, supra,* 161 Cal.App.4th at pp. 977–978.)[17]

Third, a standard based on the adequacy of supervision would be difficult to define. How much supervision must exist before it is more than merely nominal? And how would the decision concerning the adequacy of supervision be made?[18] This

---

[17] The trial court here relied on the second clause of the proviso in section 3333.2, subdivision (c)(2). As mentioned, the court concluded that a "restriction imposed by the licensing agency or licensed hospital" applies only to a "particularized restriction" previously imposed on an individual physician assistant. In light of our ruling, we do not need to consider the specific meaning of this clause and whether it could apply in some circumstances to a "restriction" that applies more broadly than a specific limitation on a particular licensed provider. It is sufficient for our ruling to conclude that, consistent with our Supreme Court's decision in *Bourhis*, the "restriction" mentioned in this clause must be a limitation on the scope of a provider's practice beyond simply the obligation to adhere to standards of professional conduct. (See *Bourhis, supra*, 40 Cal.3d 424.)

[18] For example, would a special jury finding on whether supervision was merely nominal be necessary in a jury trial? Would an allegation of some conduct beyond mere negligence be necessary to support such a finding? If so, how would that conduct be defined, and would it require a finding of direct liability against the supervising physician(s)? Here, the operative form complaint alleged only medical malpractice (and wrongful death) with a single cause of action for "general

is an extreme case in which actual supervision was essentially nonexistent.  But even here, there was some evidence that one of the supervising physicians reviewed and countersigned at least one chart note containing a treatment plan.  Review of one chart may not be enough to constitute actual supervision, but presumably one failure to comply with a governing regulation would also not be enough to make supervision merely nominal.  Requiring a fact finder to determine in each case whether a physician's supervision of a physician assistant was sufficient for purposes of applying the MICRA damages limitation risks creating the kind of uncertainty in predicting medical malpractice damage awards that the Legislature enacted MICRA in part to prevent.  (See *Fein, supra,* 38 Cal.3d at p. 163.)[19]

Fourth, a rule that treats a physician assistant's conduct as outside the scope of his or her license whenever supervision is

---

negligence."  And, as mentioned, the trial court found the supervising physicians only derivatively liable by virtue of their responsibility for the physician assistants' conduct.

[19] Lopez argues that a physician assistant acting without the supervision required by law is "tantamount to the unlawful practice of medicine without a license."  We find the comparison unhelpful.  The physician assistants here *had* a license.  They were required to demonstrate some level of training and proficiency to obtain that license.  The issue is whether they acted outside the scope of that license in practicing without adequate supervision.  Any licensed professional who practices medicine outside the scope of his or her license in some sense is engaged in the "unlawful practice of medicine without a license."  But calling it that does not help in defining the scope of the relevant license for purposes of the MICRA damages limitation.

24

inadequate would create inconsistencies in damages depending upon whether a patient sues the physician assistant or the supervising physician.  Here, the trial court ruled that the supervising physicians were liable for the negligence of the physician assistants under agency principles.  But supervising physicians who fail to supervise a physician assistant adequately might also be directly liable for their own negligence.  (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 815 (*Delfino*) ["Liability for negligent supervision and/or retention of an employee is one of direct liability for negligence, not vicarious liability"].[20]  A supervising physician's negligence in supervising a physician assistant who commits malpractice would be within the scope of the supervising physician's "rendering of professional services."  It would therefore be subject to the damages limitation in section 3333.2.  (Cf. *Bell v. Sharp Cabrillo Hosp.* (1989) 212 Cal.App.3d 1034, 1048–1052 [the MICRA damages limitation applied to a hospital's alleged negligence in reviewing the competence of a staff surgeon].)  Permitting an unlimited award of noneconomic damages against the physician assistant and only

---

[20] In concluding that an employer may be liable for negligent hiring, the court in *Delfino* followed the rule described in section 213 of the Restatement Second of Agency.  (*Delfino, supra,* 145 Cal.App.4th at p. 815.)  That section explains that the principle of direct liability is based upon the principle/agent relationship:  "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless" "in the supervision of the activity."  (Rest.2d Agency, § 213, subd. (c).)  That principle applies to a supervising physician as it would to an employer.

25

a limited award against the supervising physician based upon the same harm would be both irrational and inconsistent with MICRA's goal of predictability in damage awards.

Finally, a bright-line rule that the limitation on noneconomic damages in section 3333.2 applies to actions for professional negligence against a physician assistant once he or she has formed a legal agency relationship with a supervising physician is consistent with the principle that "MICRA provisions should be construed liberally in order to promote the legislative interest in negotiated resolution of medical malpractice disputes and to reduce malpractice insurance premiums." (*Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 215.) As the trial court here correctly recognized, once an agency relationship is formed, both the supervising physician and the physician assistant are legally responsible for malpractice that the physician assistant commits during the relationship. The risk of such malpractice therefore presumably affects the malpractice premiums of the supervising physician as well as the physician assistant. The supervising physician's risk (and therefore his or her insurance premiums) would be increased if the MICRA damages limitation did not apply whenever there is a finding that his or her supervision of a physician assistant was inadequate.[21]

---

[21] We do not intend to diminish the importance of the other policy at issue here of providing adequate compensation to injured parties. This case tragically illustrates how the imposition of the MICRA limits (unchanged since the 1970's) woefully fails to adequately compensate the plaintiff for the damages sustained by this professional negligence.

If the Legislature disagrees with the line that we draw here, it is of course free to establish a different rule.  However, absent further legislative direction, the rule that we articulate in this opinion should best serve the goals of predictability of damage awards, consistency in the application of the damages limitation, and the liberal construction of MICRA's provisions.

**DISPOSITION**

The judgment is affirmed.  Defendants are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

I concur:


CHAVEZ, J.

*Lopez v. Ledesma,* B284452

ASHMANN-GERST, J.—Dissenting

I respectfully dissent.

Neither Suzanne Freesemann (Freesemann) nor Brian Hughes (Hughes) was supervised when they provided care to Olivia Sarinanan (Olivia). I conclude they were not providing services within the scope of services for which they were licensed for purposes of Civil Code section 3333.2, subdivision (c)(2) and MICRA[1] does not apply.

## I. The Trial Court's Findings.

### A. Background.

Freesemann and Hughes are physician assistants who must work under a supervising physician. Both a physician assistant and a supervising physician must sign and date a delegation of services agreement (DSA) and practice guidelines. A supervising physician "must be available in person or by electronic communications at all times when the [physician assistant] is caring for patients. Retrospectively, the [supervising physician] is to perform a chart review of at least 5% of the

---

[1] MICRA is an acronym for the Medical Injury Compensation Reform Act.

1

medical records of patients treated by the [physician assistant] within 30 days of such treatment and which treatment, in the [supervising physician's] opinion, represents the most significant risk to the patient due to the diagnosis, problem, treatment or procedure."

 B. <u>Freesemann Functioned Autonomously</u>.

 Dr. Glenn Ledesma practiced in dermatology for over 28 years. "For some period before 2010, [Dr.] Marshall Goldberg, a dermatologist, practiced with Dr. Ledesma."

 In 2010, Dr. Ledesma operated dermatology clinics and held himself out as the medical director. He testified that he became disabled and unable to practice medicine in 2010. Also, he testified that even though he was still involved in operating his clinics "in a business sense, he was no longer in active practice as a physician[.]"

 Freesemann treated Olivia on December 8, 2010, June 11, 2011, and July 27, 2011. She claimed she had a DSA with Dr. Goldberg, but he was "no longer affiliated" with the practice in late 2010. "The DSA between Dr. Goldberg and [Freesemann] . . . had no application or continued force[.]" Freesemann had a DSA with Dr. Ledesma dated January 1, 2009. Their DSA was "nominally (but not effectively . . .) in effect" when she first saw Olivia. "Dr. Ledesma was no longer fulfilling any . . . supervisory obligations under the January 1, 2009 DSA. . . . He had removed himself from the practice of medicine." The trial court found that it was highly likely that Freesemann knew that Dr. Ledesma was not fulfilling his statutory obligations. "The evidence shows (1) that he was not available in person or by electronic communications at all times when [Freesemann] was caring for

Olivia, a violation of 16 CCR Section 1399.545(a); (2) that he was not selecting for chart review those cases in which she had rendered care and which represented in his judgment by diagnosis, problem, treatment or procedure the most significant risk to the patient, [in] violation of 16 CCR Section 1399.545(e)(3); and (3) that he was not within 30 days reviewing, countersigning and dating a minimum of [a] 5% sample of medical records of patients treated by [Freesemann] under protocols, a violation of 16 CCR Section 1399.545(e)(3)." Dr. Ledesma "testified that he was not doing so, and the [trial court] believes him."

The trial court found that Freesemann "violated 16 CCR Section 1399.540(d) which provides, '[a] physician assistant shall consult with a physician regarding any task, procedure or diagnostic problem which the physician assistant determines exceeds his or her level of competence or shall refer such cases to a physician.' [Freesemann], the evidence shows, at the time of [her] clinical encounters with Olivia, consulted with no physician affiliated with the Ledesma clinics on any topic at all. There are only two possible explanations for her not doing so. One is that she never once determined that anything she was encountering in her practice exceeded her level of competence. That explanation requires [Freesemann] to have had a remarkably generous subjective (and objectively unrealistic) belief in her competence. The other explanation is that there was simply no [supervising physician] available to her. The [trial court] finds the second alternative to be highly likely. Dr. Goldberg was gone [and] Dr. Ledesma was absent and unavailable. . . . Evaluating her credibility, the [trial court] finds [Freesemann] a reality-based person possessed of common sense. The [trial court] does

3

not think she actually believed in her own infallibility. . . . She did decide, however, to practice without [a supervising physician] and without adequate consultation with any physicians. The [trial court] finds it is a virtual certainty she knew she was doing so in obvious violation of the regulations. She was functioning autonomously and she knew it. This was a violation of 16 CCR Section 1399.545(f)." (Fn. omitted.) At the time of her clinical encounters with Olivia, Freesemann was not operating under required supervisory guidelines. "No witness produced any evidence of any such written guideline[s]. . . . The [trial court] finds, more likely than not, none were in existence."

C. <u>Hughes Functioned Autonomously</u>.

Dr. Bernard Koire was a plastic surgeon who entered a consulting contract with Dr. Ledesma's clinics and had a signed but undated DSA with Hughes. As of January 2011, Dr. Koire had had a stroke before ever meeting Hughes, and Hughes knew Dr. Koire was no longer in active practice.

Hughes treated Olivia on January 3, 2011, January 17, 2011, and September 9, 2011.

The evidence showed that Dr. Koire "was not available in person or by electronic communication[] at all times when [Hughes] was caring for patients during the intervals when he was treating Olivia, a violation of 16 CCR Section 1399.545(a)." The trial court found it "likely that [Hughes] knew that he was . . . functioning autonomously." Dr. Koire reviewed the chart note for Hughes's September 9, 2011, encounter with Olivia, but that occurred 88 days later, not within the required 30 days. Hughes "was not operating under required supervisory 'guidelines' as required under 16 CCR Section 1399.545(e)."

4

## II. Statutory Interpretation.

This appeal hinges on the meaning of "supervision" in former Business and Professions Code sections 3501 and 3502 and the regulations governing physician assistants as well as the phrase "services are within the scope of services for which the provider is licensed" in Civil Code section 3333.2, subdivision (c)(2).

When we are called upon to interpret a statute, our goal is to effectuate the intent of the Legislature. If the language used has a plain meaning such that it is clear and unambiguous, we must honor it. But if it is susceptible to more than one reasonable interpretation, we will construe its meaning bearing in mind the statute's purpose, the evils to be remedied, the legislative history, public policy, contemporaneous administrative constructions, and the consequences of that will flow from the different possible interpretations. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1328, 1338.) Statutory provisions should be harmonized to the extent possible. (*People v. Honig* (1996) 48 Cal.App.4th 289, 328.) A caveat to these rules is that courts "cannot, under the guise of statutory interpretation, rewrite [a] statute. [Citations.]" (*People v. Nettles* (2015) 240 Cal.App.4th 402, 408; Code Civ. Proc., § 1858 ["In the construction of a statute . . . , the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"].)

Where, as here, a reviewing court interprets a former statute that has been amended, I note the following. If a statute clarifies rather than changes existing law, "courts interpreting

the statute must give the Legislature's views consideration. [Citation.]" (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 246.)

A. <u>Supervision</u>.

Given that Freesemann and Hughes were not supervised, the only way to conclude that they acted within the scope of their licenses and therefore are protected by MICRA is to equate the existence of their DSAs with the supervision required by former sections 3501 and 3502. I conclude that this interpretation would improperly eliminate the necessity of actual supervision and should be rejected.

The former version of Business and Professions Code section 3501, subdivision (f) operative in 2011 defined "supervision" to mean "that a licensed physician and surgeon oversees the activities of, and accepts responsibility for, the medical services rendered by a physician assistant." The current version retains the same definition and then adds: "Supervision . . . require[s] the following: [¶] (A) Adherence to adequate supervision as agreed to in the practice agreement.[2] [¶] (B) The physician and surgeon being available by telephone or other electronic communication method at the time the [physician assistant] examines the patient." (Bus. & Prof. Code, § 3501 (f)(1).) This incorporates the regulatory law that existed since 2011. It required a DSA (Cal. Code Regs., tit. 16, § 1399.545,

---

2       As the majority notes, a practice agreement and a DSA have the same meaning. (Bus. & Prof. Code, § 3501, subd. (k).)

6

subd. (a)), and it also required the physician and surgeon to be available by telephone or other electronic means.  (Cal. Code Regs., tit. 16, § 1399.540, subd. (b).)

In 2011, former Business and Professions Code section 3502, subdivision (a) provided that "a physician assistant may perform those medical services as set forth by the regulations of the board where the services are rendered under the supervision of a licensed physician[.]"  The current version of the statute provides that a physician assistant may perform medical services if:  (1) the physician assistant renders the services under the supervision of a licensed physician and surgeon; (2) the physician assistant renders the services pursuant to a practice agreement; (3) the physician assistant is competent to perform the services; and (4) the physician assistant's education, training and experience has prepared him or her to render the services.  (Bus. & Prof. Code, § 3502, subd. (a)(1)-(4).)  "A supervising physician and surgeon shall be available to the physician assistant for consultation when assistance is rendered[.]"  (Bus. & Prof. Code, § 3502, subd. (b)(2).)  It is apparent that the current version of the statute incorporates relevant regulations existing since 2011, which provided (1) a "physician assistant may only provide those medical services which he or she is competent to perform and which are consistent with the physician assistant's education, training, and experience, and which are delegated in writing by a supervising physician who is responsible for the patients cared for by that physician assistant" (Cal. Code Regs., tit. 16, § 1399.540, subd. (a)), and (2) a "physician assistant shall consult with a physician regarding any task, procedure or diagnostic problem which the physician assistant determines his or her level

7

of competence or shall refer such cases to a physician" (Cal. Code Regs., tit. 16, § 1399.540, subd. (d)).

The dictionary definition of "supervise" is "to oversee (a process, work, workers, etc.) during execution or performance; . . . ; have the oversight or direction of." (<https://dictionary.com/browse/supervise> [as of Mar. 17, 2020].) Former section 3501, subdivision (f) defined supervision to mean a physician both oversees the activities of, and accepts responsibility for, a physician assistant. There is no ambiguity. The plain meaning of "supervision" under the former statutory scheme included actual oversight by a physician separate from the acceptance of responsibility.

Also, by incorporating existing regulations into the current versions of sections 3501 and 3502, the Legislature has clarified that supervision in the prior versions required adherence to adequate supervision as agreed to in a practice agreement (or DSA), and that a physician assistant could perform services when, among other things, there was both supervision and an existing practice agreement (or DSA). Regardless, this is what the regulations have required since 2011.

Finally, the mere existence of a practice agreement (or a DSA) does not equate to supervision in the former versions of sections 3501 and 3502; if it did, the actual oversight component of supervision would have been illusory.

Looking forward, equating supervision with a practice agreement (or DSA) would render the actual oversight component of supervision in the current version of Business and Professions Code section 3501, subdivision (f) meaningless for new cases. Also, as to the current version of the statute, it would conflate

8

Business and Professions Code section 3502, subdivision (a)(1) (requiring supervision) and subdivision (a)(2) (requiring a physician assistant to render services pursuant to a practice agreement) and essentially nullify subdivision (a)(1).  Though the current versions of the statutes are not directly at issue, they are impacted because our interpretation will apply in future cases.  For this reason, I note that "an interpretation which would render terms of a statute surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning.  [Citation.]"  (*California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 378.)  I decline to nullify the requirement of actual supervision when a physician assistant is claiming MICRA protection.

My interpretation is consistent with the 2011 (and current) regulations requiring that a "supervising physician shall be available in person or by electronic communication at all times when the physician assistant is caring for patients" (Cal. Code Regs., tit. 16, § 1399.545, subd. (a)), and that the "supervising physician has continuing responsibility to follow the progress of the patient and to make sure that the physician assistant does not function autonomously" (Cal. Code Regs., tit. 16, § 1399.545, subd. (f)).  These regulations contemplate actual oversight of a physician assistant.

B. <u>Services Within the Scope of Services for which a Health Care Provider is Licensed</u>.

Civil Code section 3333.2, subdivision (a) provides:  "In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to

9

recover noneconomic losses[.]" (Civ. Code, § 3333.2, subd. (a).) In such an action, noneconomic damages are capped at $250,000. (Civ. Code, § 3333.2, subd. (b).)

A health care provider is defined as any person licensed pursuant to Division 2 of the Business and Professions Code. Because physician assistants are governed by Chapter 7.7 of Division 2 of the Business and Professions Code, they squarely fall within the definition of a health care provider. (Civ. Code, § 3333.2, subd. (c)(1).) The statute goes on to define professional negligence to mean "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Civ. Code, § 3333.2, subd. (c)(2).)

Civil Code section 3333.2 applies to two broad categories of licensees: those who are licensed to act autonomously and those who are licensed to act under supervision. This last clause is straightforward when it relates to a person who is licensed to act autonomously. But what does it mean for someone like a physician assistant?[3]

---

[3] *Waters v. Bourhis* (1985) 40 Cal.3d 424 and *Prince v. Sutter Health Central* (2008) 161 Cal.App.4th 971 do not help resolve this question. Neither case involved a medical provider who required supervision but acted autonomously.

10

The common sense understanding of Civil Code section 3333.2, subdivision (c)(2) is that MICRA applies only if the physician assistant is supervised. After all, acting autonomously is not within the scope of the services for which he or she was licensed (former Bus. & Prof. Code, § 3502, subd. (a)), and the applicable regulation imposes an obligation on physicians to ensure that physician assistants do not function autonomously. (Cal. Code Regs., tit. 16, § 1399.545, subd. (f).) Moreover, it defies common sense to conclude that even though an unsupervised physician assistant was barred by former Business and Professions Code section 3502, subdivision (a) from providing medical services, any medical services he or she did in fact provide were nonetheless within the scope of services for which he or she was licensed.

## III.  Application of the Law to the Facts.

Freesemann operated without supervision and knew it. Further, she did not operate under guidelines. Because she was not permitted to provide care to patients unless she was supervised, she was not acting within the scope of her license. Her conduct was not professional negligence within the meaning of Civil Code section 3333.2, subdivision (c)(2), and the cap on noneconomic damages in subdivision (b) does not apply.

I reach the same conclusion as to Hughes. Though Dr. Koire reviewed one chart note from the last time Hughes saw Olivia, that was 88 days later, and that lone, deficient act did not constitute supervision. Hughes knew Dr. Koire was no longer in

11

active practice, Dr. Koire was never available for consultation, Hughes operated autonomously, and Hughes did not operate under guidelines.

I conclude that the trial court erred when it reduced the $4.25 million award for noneconomic damages to $250,000.

_____, J.

ASHMANN-GERST